WILLIAM STEVENS

*v.*

KATE STEVENS, otherwise Kate Watt.

Where it appears that the parties lived together as man and wife for several years, were known as such, acknowledged the relation by their daily actions and by express declarations to all persons with whom they came in contact; that both were competent to contract marriage; that the cohabitation was connubial from the start, and that the result of it was a child, yet living, the marriage contract will be presumed, though there is a denial of a ceremonial marriage, it appearing that both parties are financially interested in avoiding the contract.

---

Heard on pleadings and proofs.

*Mr. William P. Douglass,* for the complainant.

*Mr. Godfrey B. Mattheus,* for the defendant.

PITNEY, V. C.

The object of the bill is to obtain a decree of nullity of a marriage ceremony performed between the parties on the 10th of February, 1889. The ground relied upon for such decree is that at the time of the marriage, the defendant, Kate Stevens, was the wife of one James Watt, and that he was and is still living

The undisputed facts in the case are that James Watt and the defendant lived together as man and wife for several years in Jersey City, were known as such, and acknowledged the relation by their daily actions, and by express declarations to all persons with whom they came in contact; that the result of such cohabitation was one child, born May 13th, 1881, named Harvey Watt, still living, and acknowledged by James Watt to be his son.

The physician who attended the defendant on the occasion of the birth of this child, made a report to the board of health and vital statistics of Hudson county that the child was born on the 13th of May, 1881, that its mother was Kate Watt, whose maiden name was Evans, and the father was James Watt. Some time about the year 1886 they quarreled and separated, the defendant still going by the name of Mrs. Watt, and James Watt taking the son and providing for him.

Some time in the year 1888, the complainant, then a young widower, met the defendant. She was introduced to him as Mrs. Watt. According to his story—and I think that in this respect he is reliable—she told him that she had been married to James Watt, but that she had been divorced from him, and that her divorce papers were in her sister's custody, and, believing that, he went through a ceremony of marriage with her on the 10th of February, 1889, before Joseph Wilkinson, a justice of the peace of the county of Hudson, since deceased. The complainant swears that Wilkinson asked each of them the usual questions, and that the defendant stated that she was the divorced wife of one Watt. The original marriage certificate signed by the justice was produced before the master from the files at Trenton, and on the back of it was a certificate, signed

by the complainant and the defendant in their own handwriting, to the effect that,

> "We, the parties named in the within certificate, hereby certify that the information herein given by each of us is correct to the best of our knowledge and belief."

The certificate itself is in the usual printed form for marriage returns, furnished by the state bureau of vital statistics, with blanks to be filled in by the officer who performed the ceremony. I give so much as relates to the bride in full, as follows, the written parts being in italics :

> "1. Full maiden name of wife, *Kate Evans*, country of birth, *Pennsylvania*.
> "2. Place of residence *151 Van Horn St., Jersey City, N. J.*
> "3. Age, nearest birthday *30*.
> "4. Last name if a widow [a pen line through the printed words "a widow"] *Divorced Watt*. Number of bride's marriage *second*.
> "5. Name of father *Harvey Evans*. Country of birth *Pa*.
> "6. Maiden name of mother *Elenor Sincox*. Country of birth, *Pa*."

Defendant hardly denies that she gave this information to the justice. She does not deny that it is accurate in all respects except as to her being divorced and the marriage being a second one, and the evidence discloses no means by which the justice could have obtained the information as to her pedigree except from her in person.

One of the witnesses to the marriage swears that she heard the justice ask the defendant whether she was a widow or divorced, and that she said she was neither ; and the defendant swears to the same thing, but she is unable to account for the details of information contained in the certificate being given to the justice except by herself. And the witness is shown by her cross-examination not to be reliable.

It is suggested that this assertion of a prior marriage and divorce was a mere ruse, resorted to for the purpose of satisfying the curiosity of the justice, who had heard the defendant called "Mrs. Watt." I think this explanation unsatisfactory. In fact, it does not appear clearly that the justice had observed that she had been called "Mrs. Watt." He had no previous

acquaintance with her; was simply called in to perform this ceremony; and if it did happen that he heard her called "Mrs. Watt," I think that circumstance could have been explained more easily than to have resorted to the cumbrous fiction of a prior marriage and divorce.

Complainant swears · that after they had lived together for about six years they quarreled and separated, and that he entered into an agreement to pay her $15 a month for her support; that shortly before filing the bill, he ascertained that she had never been divorced from Mr. Watt, and declined to pay any further alimony.

The defendant and James Watt both swear that they never were divorced, but they further swear that there never was any marriage ceremony between them. His language on direct examination is this: "I was never married to her; never signed any contract that she and I should live together as wife and husband." He further swears:

"She was known as Mrs. Watt all the time we lived in Jersey City. They always took her for such. She was addressed as Mrs Watt by people in my presence. I never objected against it. I know people took her for my wife and me for her husband. Neither of us objected as I know of. When I say I was never married to her I mean that no marriage ceremony was ever celebrated between us."

The defendant, called in her own behalf, denies the marriage in these words: "I was never married to Mr. Watt." She does not deny that there was a contract of marriage between them unaccompanied by the sanction of a magistrate or clergyman.

With regard to the state of the law in New Jersey in respect to what are called common-law or non-ceremonious marriages, I refer to the following cases:

*Pearson* v. *Howey, 6 Halst. 12,* a common-law action of dower, in which the question was whether the demandant was lawfully married to the decedent. The marriage ceremony was actually performed by a justice of the peace outside of the county for which he was commissioned, and the question was as to the legality of such a marriage. The three judges—Chief-

Justice Ewing, Justice Ford and Justice Drake—concurred in holding that the justice might perform the ceremony in any county. Justice Ford went farther and said : " The parties joined together were not related within any prohibited degree, nor under any disability for want of age or understanding ; they were free, able and willing as it respected themselves, and they contracted marriage before him [the justice of the peace] in words of the present tense, taking each other as husband and wife. I consider it to have been long and fully settled at law that such is a valid marriage, even if William Harrison, Esq., had not been a justice of the peace. It is a maxim in the common law, as ancient as the law itself, that *consensus, non concubitus, facit nuptias.* It is the contract that makes the marriage. Such also has ever been the law or maxim of the church, in all ages, as well as the common law." He then cites various old English authorities in support of his position and says : " The common law requires nothing more of parties who are under no legal disability than proof of a contract, made in words of the present time, as, we take each other *now ;* not that we *will,* at a future time, take each other, for this amounts to no more than an engagement which may never be fulfilled." He then holds that the statute which authorizes certain persons to perform the marriage ceremony is not restrictive and does not alter the common law in this respect.

In *Voorhees* v. *Voorhees, 1 Dick. Ch. Rep. 411* (at *p. 413*), Vice-Chancellor Van Fleet says : " Two essentials of a valid marriage are capacity and consent." And on *p. 414* he says : " Marriage is a civil contract and no ceremonial is indispensably requisite to its creation. A contract of marriage made *per verba de præsenti* amounts to an actual marriage and is valid," quoting *O'Gara* v. *Eisenlohr, 38 N. Y. 296.*

The same rule prevails in Pennsylvania. *Richard* v. *Brehm, 73 Pa. St. 140.*

*Smith* v. *Smith, 23 Vr. 207,* was also an action of dower, and the question was whether the demandant was lawfully married to the decedent. The demandant became acquainted with the decedent in Vermont, and when they proposed to get married

suddenly in Vermont they met with some statutory difficulties, and decided to go to Massachusetts to be married, and for that purpose proceeded to a hotel in Charlestown. From there the demandant was conducted by the decedent to a house and introduced to a gentleman whom the decedent said was a minister, and the ceremony was there performed. There was no proof whatever that he was a clergyman, but the demandant believed him to be such. The statute of Massachusetts validated such a marriage, even though the man was not a clergyman. Justice Scudder, speaking for the court of errors and appeals, said: "There is nothing in our law or in any statute of this state which would make such a marriage as this invalid if performed here, and there is no reason why it should not be here recognized as entitling the demandant to dower in her deceased husband's land." There was in that case, as is well known, a second marriage by Smith, the husband, while his first wife, the demandant, was living.

Upon the probative value of cohabitation with what is called matrimonial habit and repute, I cite as follows:

The case of *East Windsor* v. *Montgomery, 4 Halst. 39*, was a contest between two townships under the Poor laws, and the question was whether a certain pauper had gained a settlement by marriage. There was an actual marriage proven, but the allegation was that the husband, John Robeson, had a wife living in Ireland when he married the pauper. There was no direct proof of the previous marriage, but it was proven by the daughter of Robeson that he lived with her mother in Ireland as husband and wife; "that they were esteemed, reputed and believed by their neighbors, acquaintances, relations and friends as lawful husband and wife, and as such visited and received by them," and that her father did always and upon all occasions acknowledge and declare her mother to be his wife, and that they must have lived together eight or nine years before her father left Ireland. It was held by the supreme court that the evidence of cohabitation with matrimonial habit and repute was sufficient to establish a prior marriage. This result was re-

versed on appeal by the old court of errors and appeals, but on what ground does not appear.

In *Wilson* v. *Hill, 2 Beas. 143*, there was one husband and two wives, Frances and Catharine. Frances claimed to have been married to the husband in 1839 in Massachusetts. Catharine was married to him many years later in New Jersey. The fact of the marriage with Frances was not proven, either by any record or by the testimony of any witness present at the ceremony, but it was proven by numerous and unimpeached witnesses that the parties—Frances and the husband—lived together, cohabiting as, and were reputed to be, man and wife for many years previous to the date of this transaction; that during such cohabitation she had two children, which were recognized by the husband as his; that in the year 1847, while the husband and Frances were so living together, a deed was executed to her of a tract of land, which contained this clause: "Which tract or parcel of land is conveyed to the said Frances Hill, wife of Josiah, and to her heirs and assigns forever," &c. The husband frequently joined with Frances in deeds of conveyance of property, and united with her in the acknowledgment of these instruments as husband and wife. When her husband, however, was arrested for bigamy, and complaint was made before the grand jury, Frances went before the grand jury and swore that she had never been married to him; that she was not his wife; that the connection between them was a partnership, and she then had abandoned the use of his name. Nevertheless, Chancellor Green held that she was his lawful wife, with all its consequences.

In *Fenton* v. *Reed, 4 Johns. 52*, the question was as to whether or not a certain Mrs. Reed was the widow of William Reed. She was the wife of one Guest, who abandoned her in 1785, and seven years afterwards, she believing Guest to be dead, married Reed. Guest returned to New York after this second marriage, but never interfered with the relations between his wife and Reed, and died in 1800. After that she continued to live with Reed until his death in 1806. The supreme court held that the

court below was justified on the evidence in inferring a common-law marriage with Reed after the death of Guest in 1800.

The same principle was conceded in *Wallace's Case, 4 Dick. Ch. Rep. 534, 535*, but it was shown there that the commencement of the sexual intercourse was meretricious, and the subsequent cohabitation as man and wife was very slight and supported by insufficient evidence, and so a marriage was not presumed.

This same principle was applied in *Chamberlain* v. *Chamberlain, 71 N. Y. 423*, where the presumption of marriage, from cohabitation as man and wife, was overcome by the circumstances of the particular case.

*Clayton* v. *Wardell, 4 Comst. 230*, was this : A man was arrested, under the Bastardy act, as the putative father of a child with which a woman was pregnant, and entered into recognizances to answer the charge, and no further proceedings were had. There had been no previous matrimonial habit and repute. He then at once went to live with the female as her husband, and continued to do so until some time after the child was born and died, when he separated from her, and they entered into the usual articles of separation between husband and wife, in which they spoke of each other as husband and wife, and in which a third person indemnified the husband against any claim of the wife. Shortly after this the woman went through the ceremony of marriage and lived for years with another man as his wife, and had one child, and the question was as to the legitimacy of this child, the offspring of the first connection being dead. The surrogate before whom, as judge, the question first came, held that the first marriage was established. His decision was reversed by the supreme court, and such reversal was sustained, on appeal, by the opinions of Justices Harris, Ruggles, Hurlbut, Taylor and Pratt, against Chief-Justice Bronson and Justices Jewett and Gardiner. There was no proof of any formal marriage between the man and the alleged first wife, and the decision of the majority of the court was arrived at upon the ground that the intercourse between the parties was in its commencement meretricious, and there was perhaps as much reason to believe that their subsequent connection was of the same

character as that a marriage had, in fact, taken place; and for that they cite the opinion of Lord Eldon, in *Cunningham* v. *Cunningham, 2 Dowl. Pr. C. 482*. On the other hand, the opinions of Justice Gardiner, Chief-Justice Bronson and Justice Jewett were that the cohabitation and holding themselves out to everybody as. man and wife, and the entering into the articles of separation as such, were sufficient proof of an actual marriage.

A perusal of the opinions on either side in this case convinces me that the minority were in the right, and I think it probable that their views would have prevailed but for the fact that the effect would have been to bastardize a living issue of a ceremonial marriage.

An interesting case is *In the Matter of Taylor, a Lunatic, 9 Paige 611*. Taylor married and had four children by a wife who died shortly after the birth of the last child, and a year later took to his bed a housekeeper or servant who had been in his house all the while, lived with her for ten or twelve years and had two or three children by her. There was no proof of a ceremonial marriage, but he introduced her to all his friends as his wife and entered the names of her children in the family register. In 1816 Taylor went to England and left his family in New York, and while there this second wife or mistress, whichever she was, wrote him a letter, which was produced in evidence, in which was an admission on her part that there had been no ceremonial marriage between them, and he himself also made the same statement in writing on his return. It was held by Chancellor Walworth that the living in matrimonial habit and repute with the second woman for so many years and having children by her was sufficient to enable the court to presume a common-law marriage between them, and that this view could not be overcome by the admissions of Mr. and Mrs. Taylor, made subsequently, and therefore not a part of the *res gestæ;* and he declared the issue of the second connection to be legitimate.

It is impossible not to discover in all these cases a disposition on the part of the court to hold in favor of the marriage where there is issue which may be bastardized by a contrary ruling.

And the same is to be said of the much-debated cases of *Campbell* v. *Campbell, L. R. 1 H. L. Cas. (Sc. App. 1867) 182 (Breadalbane Case)*, and *De Thoren* v. *Attorney-General, L. R. 1 App. Cas. (1876) 686*, referred to by Justice Garrison in his dissenting opinion in *Collins* v. *Voorhees, 2 Dick. Ch. Rep. 315*, on appeal from *Voorhees* v. *Voorhees, 1 Dick. Ch. Rep. 411.*

In the English cases just cited the intercourse between the parties had an unlawful beginning. At its inception one of the parties in each case was incapacitated to marry by reason of pre-connubial contract, not dissolved by death or divorce, and in each the connubial intercourse continued after the impediment was removed. In the *"Breadalbane"* *Case* the incapacity was known to both of the parties. In the case of *De Thoren* v. *Attorney-General* it was unknown to both the parties. The house of lords held that the unlawful inception, under the peculiar circumstances of those cases, did not prevent the prevalence of the presumption, arising from the continued matrimonial habit and repute, that a marriage contract was actually made after the removal of the impediment. This court and the court of errors and appeals (*2 Dick. Ch. Rep. 555*) held the contrary upon the circumstances of the case in *Collins* v. *Voorhees*, where one of the parties knew of the impediment and the other did not. In both of our courts, however, the sufficiency of the proof by matrimonial habit and repute, and the validity of a non-ceremonious marriage, was recognized, but the probative proof in that case was held to be overcome by the circumstance that its origin was shown to be illegal by reason of incapacity of one of the parties, due to pre-contract.

In the case in hand there is nothing to show any want of capacity to contract between Watt and the defendant when they commenced their cohabitation. Both were competent to contract marriage, and, so far as appears, the cohabitation was connubial from the start. There is no proof, as in *Clayton* v. *Wardell, supra*, that the connection commenced meretriciously or that legal measures were resorted to by the defendant to compel Mr. Watt to live with and support her, or that she was a woman of loose character, as in *Chamberlain* v. *Chamberlain, supra,*

32

and avowedly accepted the position of a mere mistress. In fact, the indications are that the parties here, as in the two cases in the house of lords, were faithful spouses to each other during the entire period of their cohabitation.

If the question here was as to the legitimacy of the issue of this connection, the evidence would be ample and well-nigh conclusive to sustain it, even as against the denial by the parents of a ceremonial marriage. Such was the opinion of Chancellor Walworth, *In the Matter of Taylor, supra*, and of Chancellor Green in *Wilson* v. *Hill, supra*. That denial, however, as I read it and construe it, does not necessarily include a private parol contract of marriage in which they, in substance, said to each other, " Let us be husband and wife, and live together as such." And in considering what weight is due here to the denial of marriage, it must be borne in mind that both Watt and the defendant are interested in sustaining the later marriage; the defendant is interested in retaining her separation contract with complainant, and Watt is interested in being relieved of any duty to the defendant. I think the clear weight of the evidence is that there was such a contract. And if there was such a contract, accompanied as it was by actual connubial cohabitation, it is binding on the parties, and cannot be laid aside at their pleasure. They may have supposed that it was not binding, because non-ceremonious, and this supposition may account for their subsequent conduct.

In this connection it must be observed that the well-settled rule is that presumption of marriage in such a case is very strong, and not to be easily overcome. *Piers* v. *Piers, 2 H. L. Cas. (1849) 331; De Thoren* v. *Attorney-General, L. R. 1 App. Cas. (1876) 686*.

Against this view is urged what was said by me in the case of *Rooney* v. *Rooney, 9 Dick. Ch. Rep. 231*, namely, that " in a suit for nullity by reason of pre-contract with a living person, strict proof is required of such prior contract." But whatever was there said on that subject must be construed in connection with the circumstances of that case, namely, that a party who comes into a court of justice and asks for a decree of nullity of

marriage and the bastardizing of the issue thereof, by reason of his own pre-contract with a living person, of which he was himself conscious when he entered into the contract, must make such proof clear. If there had been issue of the marriage between the parties to this suit, and the defendant was suing the complainant for a decree of nullity by reason of her pre-contract with Watt, and the result of the decree was to bastardize issue, then the ruling in the case of *Rooney* v. *Rooney* would be more in point. As it is, I do not think it applies.

I will advise a decree for the complainant.