RHODE ISLAND HOSPITAL TRUST CO. *vs.* HANNAH THORNDIKE *et al.*

PROVIDENCE—APRIL 21, 1902.

PRESENT : Stiness, C. J., Tillinghast and Rogers, JJ.

(1)  *Husband and Wife.    Presumption of Marriage.    Evidence.*

The burden of proof of establishing a marriage is upon those setting it up.

There is no one absolutely necessary manner of proving a ceremonial marriage to the exclusion of all other methods.    It may be proved by the testimony of persons present who saw the marriage, and the parties to an alleged marriage may be witnesses for or against it unless rendered incompetent by some statute provision.    The record of the marriage and marriage certificate are also competent evidence of the marriage, but the register of the marriage is not *the best* evidence.    Cohabitation, reputation, declarations and conduct of the parties, and reception among friends and neighbors are all admissible in evidence, though their probative weight, under all the circumstances, is for the court.

Upon an issue as to the existence of a marriage between T. and E., it appeared from the testimony of E., the alleged wife, who was in no way interested in the suit, that she was married in 1871 in New Jersey by F., a Methodist minister ; that he gave her no certificate of marriage ; that they lived together as man and wife in New York and Massachusetts ; that T. introduced her to his relatives as his wife, making annual visits to some of their houses until he deserted her in 1882 and quit the country.    He constantly corresponded with her, and she produced letters written by him to her in which he called her his wife.    In 1881 T. executed a deed with her, in which she was described as his wife.    Several sisters and brothers of T., as well as other witnesses, testified that T. and E. were received and generally reputed to be husband and wife.    In 1883, in London, T. was married to H., the latter producing a certificate thereof. From that time until his death T. and H. lived together as man and wife, in England until 1891 and in various parts of this country there-

after, including New Jersey, during which latter period they were visited by some members of his family. They had issue five children. E. had no children by T. F. and his wife, who was a witness to the marriage, had deceased, and there was no record of the marriage to E., as required by the New Jersey statutes :—

*Held*, that the evidence established a marriage between T. and E.

Bill in Equity in the nature of a bill of interpleader. Heard on bill, answers, and proofs.

Rogers, J. This is a bill in equity brought by the complainant corporation as trustee under the trusts of the will of the late Sarah Thorndike. It is in the nature of a bill of interpleader and seeks the instruction of the court in the payment of a part of the income of a certain trust fund. The will placed $105,000 in trust, the income of $50,000 of which was to be paid to James F. Thorndike, son of the testatrix, during his life ; and of the remaining $55,000 the sum of $10,000 was to be paid to each of his sons James Edward Thorndike and J. Prince Thorndike ; $5,000 to each of his two sons Charles F. Thorndike and Herbert Arthur Thorndike ; the income of $5,000 to or for the benefit of his son Samuel B. Thorndike for life, and the income of $5,000 each to his three daughters Sally H. Clark, Caroline M. Thorndike and Grace Thorndike for life respectively.

In the language of the will,—"Upon the death of said James F. Thorndike or any of the abovenamed children of said James F. Thorndike, receiving interest according to the above provisions of this instrument, then the interest to which he or she would be entitled to be divided among the surviving brothers and sisters abovenamed, (and no part thereof in any event to go to any child or children of said James F. Thorndike not named in this instrument) in proportion to the sums abovenamed. But if any one of the abovenamed children of James F. Thorndike die leaving lawful issue the interest or income to which said child if living would be entitled, shall be paid to or for the support of such lawful issue.

"I do further order and direct, that upon the death of said James F. Thorndike and the last survivor of his abovenamed

children, that part of said sum of $105,000 not previously paid out by my said trustee, to wit, to James Edward, J. Prince, Charles, and Herbert, shall be distributed and paid over to the lawful issue then living of any one or more of said children, to wit, the children of James F. Thorndike named in this instrument, in the same proportion in which they would be entitled if such child or children whose issue may so survive had died possessed of said trust property in his or her own right, and, if more than one, in equal shares."

The bill alleges that the said James F. Thorndike died on the —— day of ————, 18—, and that thereafter and since the complainant became trustee the proper proportional part of the income of said trust fund of $50,000 was paid to his son, the said James Edward Thorndike, during his life ; that the said James Edward Thorndike died November 24, 1899, at Bayonne, in the State of New Jersey, where, he then and for about two years prior thereto had lived with his family, which then consisted of Hannah Thorndike who claims to be his widow and to whom, the complainant is informed, he was married in England, October 10, 1883, and with whom, the complainant is also informed, he ever after during his life lived as his wife, and his five children by her who are all now living with her at said Bayonne, the bill giving the names and ages of said children ; that after the death of said James Edward Thorndike and on December 13, 1899, the complainant received a letter from Elizabeth Gale Thorndike notifying it that she was the wife of said J. E. Thorndike, giving the details of her marriage ; that he deserted her seventeen years ago since which time she has had no communication with him, and was surprised to learn that he had a wife, other than herself, and five children.

The bill further alleges that in December, 1877, the complainant received from the said James E. Thorndike an order (addressed to Charles H. Sheldon, who was then its secretary) directing the payment of certain money then shortly to become due to him,—in the words of the order,—"to my wife Elizabeth Gale Thorndike."

The bill further alleges that the complainant has made

such inquiries as it has been able, by correspondence with the brothers and sisters of said James, and with public authorities respecting the alleged marriage to Elizabeth Gale Thorndike without being able to conclusively establish the facts respecting the same, or whether if such marriage ever took place it was ever dissolved or annulled by divorce or otherwise ; and that under these circumstances, and more especially as the surviving brothers and sisters of said James E. Thorndike, or some of them, now claim that said James was in fact truly and legally married to the said Elizabeth, and that such marriage was never dissolved or annulled by divorce or otherwise, and also claim that inasmuch as he left no issue by her, he left no issue entitled to the income of said trust fund, that they, therefore, under the terms and limitations of said will, are now entitled to receive the said income from the complainant, it cannot safely pay over the same to any one without and except under the protection of, the decree of this court.

The bill further alleges that the said Charles F. Thorndike, brother of said James E. Thorndike, has deceased without leaving issue, and that the said J. Prince Thorndike, another brother of the said James E. Thorndike, has transferred his interest in his share of said income to his wife Flora J. Thorndike, and prays that the respective parties respondent may interplead as between themselves as to their respective claims to the income of said trust fund of $50,000, and that the complainant may have the instruction of the court and the protection of its decree in paying over said income.

Hannah Thorndike and her children, the alleged wife and children of the said James E. Thorndike, and all the surviving brothers and sisters of the said James E., being the surviving children of the said James F. Thorndike that are named in the said provision of the said Sarah Thorndike's will, together with Flora J. Thorndike, the transferee of the said J. Prince Thorndike's share of the income, are all made parties respondent ; and the case is now before us upon bill, answers and proofs, the minor children of the said James E. Thorndike being represented by their *guardian ad litem*.

Practically, the sole question in this case is : Are the minor respondents the *lawful* issue of the said James E. Thorndike ?

That a ceremonial marriage took place in England, October 10, 1883, between their father and mother before their birth is shown by the evidence ; and the question is thus narrowed down to whether their father, at the time of such ceremonial marriage to their mother, had a legal wife living, who is still living and from whom he had never been divorced. All the respondents that are brothers or sisters of the said James E. Thorndike, with one exception, viz.: J. Prince Thorndike, oppose the claims of the minor respondents, as does also the wife and transferee of said J. Prince Thorndike, and they contend that their brother, the said James E. Thorndike died, leaving no lawful issue.

The above mentioned Elizabeth Gale Thorndike, who is not a party to this suit, nor in any way pecuniarily interested in the result thereof, a woman of upwards of sixty-two years of age, living in West Somerville, Mass., swore that in 1871, she, being an actress, and the said James E. Thorndike, a theatrical agent, were married at Rutherford Park, N. J., on July 12, 1871, by the Rev. Mansfield French, a Methodist minister, at the latter's house, and that his wife was a witness to the marriage ceremony ; that Mr. French gave her no certificate of marriage as he had none, but said he would send her one, which he neglected to do ; that they went to the Rev. Mr. French's, from New York, as he was an old army friend of James E. Thorndike, they having served together on General Rufus Saxton's staff during the Civil War ; that on their return to New York after their marriage they went to living together as man and wife at the corner of South Fifth Avenue and Bleecker street, and then after a few weeks went to Malden, Mass., to her father's ; that the said J. E. Thorndike introduced her after the marriage as his wife and lived with her as such ; that he so introduced her to her own relatives and to his relatives, which latter he frequently visited with her, making annual visits to some of their houses until he deserted her in 1882 and quit the coun-

try. He also introduced her to his friends as his wife and constantly corresponded with her, and she produced various letters written by him to her in which he calls her his wife and subscribes himself as her husband in the most ardent terms of endearment,—thus in a letter dated August 31, 1872, in which he calls her father "father," he addresses her as "My own darling wife," and says *inter alia*, "Thirty-six days since you started away from your husband, only think of it, the longest time from each other since we were married."

By 1881 the ardor of his letters had perceptibly cooled, but he still wrote her with more or less frequency, when away from her, on subjects such as a husband and wife would, it seems to us, be likely to write about, such as clothes, personal and family matters, &c., he addressing her as "Dear Lizzie" and signing himself as "Yrs Ned," or "Affectionately Ned," the envelopes being directed, sometimes to "Mrs. J. E. Thorndike" and sometimes to "Mrs. Lizzie Gale Thorndike." As late as July 16, 1881, he executed a deed with his wife and her sister of a lot of land, to one Mercy R. Talcott, in which the grantors were described as follows : "Know all men by these presents, that we, James E. Thorndike, Elizabeth G. Thorndike, wife of said James E. in her right, and Helen A. Gale, all of Malden in the County of Middlesex, and Commonwealth of Massachusetts," which said deed, signed, sealed, and acknowledged, was duly recorded in the registry of deeds for said county of Middlesex, August 5, 1881. She further swore that she had had no children by the said James E. Thorndike.

Mrs. Sarah H. Clark, a sister of the said J. Edward Thorndike, swore that Elizabeth G. Thorndike and her said brother were received as husband and wife in the Thorndike family, he introducing them to her as his wife ; that from 1871 to 1882 they visited witness at her house every summer and winter ; that on the first visit in 1871 they told her all the particulars of their marriage including time, place and circumstance ; that her brother came with said Elizabeth every year until 1882 to witness' house to visit, at which last time she came alone ; that Elizabeth Gale Thorndike was intro-

duced to family and friends by him as his wife, that they were generally reputed so to be and acted and were treated as such.

The other two sisters of J. Edward Thorndike swore practically to the same thing, one of them, Caroline M. Thorndike, swearing to an interview that took place in Boston between her brother J. E. Thorndike, the Rev. Mansfield French and herself in this wise : " It was at a bazaar, Horticultural Hall, when my brother introduced me to Rev. Mansfield French, saying,—' This is the minister that married me to Lizzie,' and I said to Mr. French, ' Is that so; ' he says, ' Yes, I married them.' "

Samuel B. Thorndike, a brother of the said James E. Thorndike, swore that his brother James introduced Elizabeth Gale Thorndike to him as his wife in September, 1874, in Chicago where he then happened to meet said James and Elizabeth.

Neither Herbert A. nor J. Prince Thorndike, the two other living brothers of the said James E. Thorndike, testified, though both put in answers, the former claiming therein that his brother James left no lawful issue, and the latter claiming that the minor respondents are the lawful issue of said James, though his wife, who succeeds to his pecuniary interest in said income, claims that the said James left no lawful issue.

In addition to the foregoing, the respondents that contest the minor respondents' claim, called five other witnesses not related to the family, who severally swore that the said James E. Thorndike had introduced the said Elizabeth Gale Thorndike to them as his wife, that they had seen them much together prior to 1882 and that the said James and Elizabeth were received and generally reputed to be husband and wife. One of these witnesses, James A. Brown, further swore that he was a dramatic agent and had known James E. Thorndike and Elizabeth Gale Thorndike as actor and actress since about 1873 or 1874, and had procured professional engagements for them, that the said James introduced the said Elizabeth to witness as his wife, and that they were generally recognized by the friends and acquaintances of the said James

E. Thorndike as husband and wife, everyone that knew them in the profession recognizing her as his wife; that he, the said witness Brown, not being aware that the said James had deserted the said Elizabeth, met him in London, and almost the first words he asked witness was "How is Lizzie, my wife?"; that after the said James returned to this country he came and reported to witness his arrival in America and left his address and wanted something to do; that witness not knowing then that he and Lizzie had separated asked him, "How is Lizzie?" that he passed it over and said "She is all right," that the witness had not seen her for years and had not seen him since he met him in London; that the said Elizabeth was known to the theatrical profession as Lizzie Gale, but that "so far as her using the name of Lizzie Gale there is not one woman in a hundred that used her married name in the profession."

For the minor respondents three witnesses were called, viz.: their mother, Hannah Hale Thorndike, Sarah Edith Parry, her niece, and one Robert M. Sterritt.

The said Hannah H. Thorndike swore substantially as follows,—that she was forty-one years old and resided at Bayonne, N. J.; that she was born at Huddersfield, England, and first met James E. Thorndike in Liverpool, (England) in 1883; that prior to her marriage to him she knew nothing of the history of his life; that she became acquainted with him through his calling on her sister, who was a professional singer, and had known him in this country, from which her sister returned to England at Christmas, 1882, to be married; that he came three months later and called on the sister who had been married to Captain Montague Bailey before he came, that from his calling on her sister she became acquainted with him; that she was married to said J. E. Thorndike in Liverpool, England, October 10, 1883, receiving from the clergyman marrying them a certificate which she produced to be annexed to her deposition; that she has never been divorced and that during all the time from the date of their marriage, October 10, 1883, until his death, she has constantly and continuously lived with J. E. Thorndike, and been recognized as

his wife by the society in which she has moved ; that, after their marriage, they lived in England until 1891, where their first four children were born, certificates of the births of which she produced ; that in the latter year they moved to America, that being the first time she ever came to this country ; that they arrived in America in March, 1891, and went to Shelburne Falls, Mass., where they stayed about three weeks at the said J. E. Thorndike's brother's Herbert A. Thorndike ; that then they went to Stafford Springs, Conn., and lived on a farm for about three years, where the said J. E. Thorndike's brothers Herbert, with his wife, J. Prince, with his intended wife, and Samuel visited them, the said Samuel boarding with them for about two years ; that from there they moved to East Norton, Mass., where they lived on a farm about two years, and where also the said J. Prince Thorndike and his intended wife visited them ; that from there they moved to Roselle, N. J., the said J. E. Thorndike getting employment in the dock department of New York city ; and that in New York city, or in New Jersey in the neighborhood of New York city they have lived ever since, living at Bayonne, N. J. last, and where she and her children now live ; and that all her children were born after her said marriage to the said James E. Thorndike. By the marriage certificate produced it appears that the said James E. Thorndike was forty-two and the said Hannah Hale was twenty-five at the time of the marriage ceremony between them.

Sarah Edith Parry swore that she was a niece of the last named witness and was present at the marriage of said Hannah and said J. E. Thorndike in Liverpool, England, October 10, 1883, and gave the names of several of the said Hannah's relatives and friends that were present ; that she lived for a year with the said Hannah after the latter's marriage and lived with her when her eldest child was born, that she arrived in America a fortnight before the said J. E. Thorndike died, and went to her said aunt's house and stayed until his death.

The only other witness called on behalf of the minor respondents was Robert M. Sterritt, who swore to knowing the

said J. E. Thorndike during the last five years of the latter's life, during the last three and a half years of which said J. E. Thorndike worked under him in the department of docks in New York. He swore to the said J. E. Thorndike's living with the said Hannah H. Thorndike and their children, and to the efforts made since said J. E. Thorndike's death to get information as to his alleged marriage with Elizabeth Gale Thorndike; that he ascertained that there was no record of such a marriage in the Bureau of Vital Statistics of New Jersey, nor in the county records of Bergen County, N. J.; that the Rev. Mansfield French had been settled in Rutherford Park, N. J., but had died some years ago.

The complainant called its vice-president, Samuel R. Dorrance, as its sole witness, who testified to the complainant's receiving the letter from Elizabeth Gale Thorndike, and the order signed by J. E. Thorndike to pay interest to the said Elizabeth, copies of both of which are set forth in the bill, and also to the efforts he had made to get information as to the Gale marriage, the result being that there was no record of that marriage to be found, the records of Rutherford Park not going back so far, and that the Rev. Mansfield French, a Methodist minister formerly at Rutherford Park, N. J., had died prior to 1880 and his wife having died in that year, and that the children of Mr. French could find no record of such a marriage. Mr. Dorrance also produced several letters received by him in procuring this information, as to which we understand there is no dispute. He also produced letters from the said J. Prince Thorndike and Herbert A. Thorndike giving statements of what their brother James E. had said to them since his marriage to Hannah H. Thorndike as to the said Elizabeth Gale Thorndike, but as said J. Prince and Herbert are both living and parties respondent and have not seen fit to be sworn, such letters in our opinion are too much hearsay to be admissible.

The question in this case is not as to which of the two alleged marriages is supported by the most evidence, but only whether there is sufficient evidence to satisfy the court that the alleged Gale marriage actually took place and lawfully

existed, for if that marriage lawfully existed at the time of his death no amount of evidence will suffice to make the issue of the Hannah Hale marriage the *lawful* issue of the said James E. Thorndike, but the burden of proof of establishing the Gale marriage is upon those setting it up, to wit, upon those respondents claiming that the minor respondents are not the lawful issue of the said James E. Thorndike.

There is no one absolutely necessary manner of proving a ceremonial marriage to the exclusion of all other methods. It may be proved by the testimony of persons present who saw the marriage, and the parties to an alleged marriage may be witnesses for or against it unless rendered incompetent by some statute provision. In New York a ceremonial marriage, that is, a solemnization before a clergyman or magistrate, is not necessary. *Bissell* v. *Bissell*, 55 Barb, 325, 328, 329, which was an action by an alleged wife against her alleged husband for a separation from bed and board on the ground of abandonment, the court said : " There can be no doubt that the testimony of the plaintiff proves an actual and valid marriage relation between the plaintiff and defendant. . . . In cases affecting the legitimacy of issue, rights of succession to property, and many other cases, such a contract may be proved by circumstantial evidence, by admissions of the parties, by their living together as man and wife, etc. But there is another class of cases, such as prosecutions for bigamy, *crim. con.* etc., in which there must be direct evidence of the actual marriage. By actual marriage is meant, not the solemnization before a minister or magistrate—for, as has already been shown, no such solemnization is requisite—but what is intended is, that the actual making of the marriage contract between the parties, must be proved by direct evidence, and not left to be inferred from circumstances, admissions, and the like. Until by recent legislation the wife was made a competent witness in actions in which her husband is a party, it is evident that where a marriage of this description was contracted in the absence of any witness, there was no means of furnishing the direct proof required in this class of cases, and offenses of this description might be committed

with comparative impunity. But now, the wife being made a competent witness, her testimony, if corroborated and entitled to credit, is sufficient to establish the marriage."

In *State* v. *Marvin*, 35 N. H. 23, 27, Perley, C. J. said: "Yet, where direct evidence of the marriage is required, other evidence besides the register may be made by the testimony of witnesses present at the marriage, or of the parties themselves, when competent." See also *Jacobsen* v. *Siddal*, 12 Ore. 280; *State* v. *Wilson*, 22 Iowa, 364; 1 Bish. Mar. Div. & Sep. § 1049 *et seq.*; 19 A. & E. Ency. of L. 2nd ed. 1198, *et seq.*

The record of the marriage, and marriage certificates are also competent evidence of marriage, but the register of the marriage is not *the best* evidence, at least not in the sense that it must be produced if obtainable, for Dr. Lushington in *Woods* v. *Woods*, 2 Curt. Ec. 516, 523, says that "the course of practice in the courts of law consider that in order to establish a marriage, the evidence of any one person present at the marriage is sufficient, without calling for the register at all;" and in *Commonwealth* v. *Norcross*, 9 Mass. 493, the court said: "The recording of marriages was intended to perpetuate the evidence of the fact, after the witnesses present shall have died. But a copy of such record is not so satisfactory evidence as the testimony of witnesses. These last, indeed, are *necessary* to prove the identity of the parties." In New Jersey where the Gale marriage is claimed to have taken place, in *Albertson* v. *Smyth*, 3 N. J. L. 65, the plaintiff offered parol testimony to prove the marriage of the defendant. Inasmuch as the marriage had been had since the passing of the marriage registry act, the defendant objected on the ground that the register or a sworn copy was the best evidence, but the presiding justice overruled the objection and admitted the proof. After verdict and judgment thereon for the plaintiff the defendant brought *certiorari* for a new trial on the alleged error, but the Supreme Court sustained the ruling and affirmed the judgment.

Cohabitation, reputation, declarations and conduct of the parties, and reception among friends and neighbors are all

admissible in evidence, though their probative weight under all the circumstances, is for the court.   19 A. & E. Ency. of L. (2nd ed.) 1204, et seq.

If Elizabeth Gale Thorndike is a credible witness then we have the most positive and direct proof of her marriage to J. E. Thorndike on July 12, 1871, by the Rev. Mansfield French at Rutherford Park, N. J.

It is argued that the said Elizabeth Gale Thorndike is not a credible witness and that her testimony should not be believed. It is contended that the case at bar is so similar to the Carpenter case (*Odd Fellows Beneficial Association* v. *Carpenter*, 17 R. I. 720) as practically to be governed by it. That was a bill of interpleader to determine whether the respondent therein, Maria H. Carpenter, claiming to be the widow of John A. Carpenter, deceased, or the other respondents, being children of the said John A. Carpenter, were entitled to a certain fund which was payable to the widow, if any, and, if not, then to the children of the said John A. Carpenter. The only question submitted was whether the said Maria was the widow of the said John. In support of her claim she testified that she kept house for the deceased from October 1, 1888, till February, 1890; that her first husband died in December, 1888; that she and deceased shortly afterwards agreed to be married to each other, and in pursuance thereof, on February 13, 1889, went to Fall River, Mass., where a ceremonial marriage was solemnized by a clergyman authorized to solemnize marriages, or before a person who was represented by the deceased to be so authorized, and whom she believed was so authorized. She did not produce any certificate of marriage, or any record evidence thereof, or any witness to the same. She could not give the name of the clergyman who performed the ceremony, nor could she tell upon what street, or in what part of said city he resided. She further testified that after said marriage she continued to live with the deceased as his wife till his death, which occurred August 3, 1889. Evidence was also offered that the deceased, on one or more occasions, spoke of the respondent as his wife, one witness testifying that he introduced her to

him as such, and also that they lived together, for a short time before the death of said John, apparently as husband and wife. It further appeared that the deceased made a will, in which he referred to the respondent as his wife, and bequeathed to her all of his property, and constituted her his sole executrix. On the other hand, the respondents, the children of the said John A. Carpenter, offered evidence to the effect that in March, 1889, the deceased stated to one of the complainant's officers that he had no wife, and that on being visited during his illness, in the same month, by a member of the order, he spoke of the respondent as "Maria, a woman that keeps house for me," also that the deceased on one occasion, upon being told that it was reported that he was married, replied—"You mustn't believe everything you hear." Upon this state of the proof, the court was not satisfied that any ceremonial marriage between the deceased and the respondent had ever taken place and decided accordingly. It was then contended that a common-law marriage, so-called, existed between the said John and the said Maria, but the court was not satisfied on that point either and said *inter alia* (page 723) "In the case at bar, while there is proof of cohabitation for a few months, it does not appear when it commenced, nor does it appear that the parties ever obtained the reputation of being husband and wife. The fact that the deceased referred to the respondent as his wife in his will, and made her his sole legatee and executrix, is not, in our judgment entitled to much weight in view of the evidence, which was submitted at the trial, to the effect that a serious unpleasantness had arisen between the deceased and his children growing out of his relations with the respondent."

The resemblances between the Carpenter case and the case at bar do not impress us so much as their differences. In but two respects do they resemble each other, for in both cases the alleged wives swore to a ceremonial marriage; in both likewise neither produced any marriage certificate or record evidence. In all other respects, however, an attempt to compare them only serves as a contrast to point their dissimilarities. In the former, or Carpenter case, the alleged

wife had a direct money interest as she sued the complainant in that case for $1,000 due the *wife*, if any, and her bringing an action therefor was the reason for the complainant's bringing the bill of interpleader.    In the latter case the Gale wife has no pecuniary interest whatsoever and is not even a party to the litigation.    In the former case, though but a few months had elapsed from the date of the alleged marriage to the bringing of the suit, the alleged wife could give no detail whatsoever, save that it took place in Fall River, but a few miles from Newport, her residence, but she could give not a single detail that one so recently married could not fail to have remembered, whereas at an interval of thirty years the Gale wife gives all the details with a particularity that inspires confidence.    In the former the cohabitation after the alleged marriage was but six months ; in the latter case it was eleven years.    In the former the alleged husband gave the alleged wife but a very uncertain and contradictory recognition ; in the latter the alleged husband recognized the alleged wife very fully and emphatically for eleven years, and introduced to his sister the clergyman as the one that had performed the marriage ceremony ; in the former the family of the alleged husband did not recognize the alleged wife as such ; in the latter the alleged husband's family without exception recognized the alleged wife as his wife for many years and, with one or two exceptions, way down to the present time ; in the former the worthlessness of probative significance of the alleged husband's making a will in favor of his alleged wife and constituting her his sole executrix, is thoroughly stated by the court in its opinion ; in the latter the force of the fact that the alleged husband ten years after the alleged marriage formally executed and delivered a deed with the alleged wife as her husband, is unshaken.    In short, so many and so glaring differences exist between the Carpenter case and the case at bar that the action of the court in the former seems to us to afford no guidance at all in the present case.

The counsel for the minor respondents in the case at bar lays great stress upon the fact that there is a registry of the

marriage between J. E. Thorndike and the respondent Hannah, while there is none as to the Gale wife.   We have already adverted to the registry of marriages as one means, merely,' of proving the existence of a marriage.   In *United States Bank* v. *Dandridge*, 12 Wheat. 64, Story, J. says, p. 81 :   "There are many cases where an act is prescribed by law to be done, and record made thereof, and nevertheless, if left unrecorded, the act ·is valid.   By the English marriage act, registers of marriages are required to be kept in public books, in every parish, and signed by the parties and the minister, and attested by two witnesses.   Yet it has been decided, that such an entry is not necessary to the validity of the marriage, and that an erroneous entry will not vitiate it.   1 Phil. Ev. c. 5, § 2, p. 326."

In New Jersey, where, according to the evidence, the Gale marriage took place, at the time of said marriage, no witnesses were required, nor any marriage license, save a certificate of the parents or guardian in case of minors; and neither of the parties were minors, though there was a statute requiring every justice or minister to keep a record of the marriages solemnized before him and to make a return thereof to the clerk of the Court of Common Pleas for the county in which the marriage was solemnized, and a justice or clergyman was liable to a penalty of fifty dollars for each neglect, omission or refusal to make such return.   Nixon's Dig. (Laws of N. J. 1709–1868) 544.   The Gale wife not having a marriage certificate is reasonably accounted for, and the clergyman's not making a record or return is reasonably enough attributable to negligence.   Indeed, in our State, the frequency of negligence in reporting marriages to the registry is indicated by the fact that not only does the delinquent incur a penalty for failing to report, but on the other hand reporting commands a fee or reward.

Where a prior marriage is informal, sometimes called a common-law marriage in contradistinction to a formal or ceremonial marriage entered into before a clergyman or a magistrate under the statute law of the place where celebrated, and such informal marriage is sought to be proved

by circumstances only, such as cohabitation, reputation, etc., there is a tendency in the decisions to favor the presumption that a subsequent ceremonial marriage is valid, especially where there is issue which may be bastardized by a contrary ruling. *Stevens* v. *Stevens*, 56 N. J. Eq. 488, 496. This presumption, such as it is, depends theoretically, on what is termed the presumption of innocence; that is that, even in civil cases, it will be presumed to a certain extent that a man will not commit bigamy, and to rebut that presumption direct or positive evidence of the prior marriage must be produced other than mere circumstantial or presumptive evidence. This presumption of innocence is always rebuttable by direct or positive evidence of the former marriage, and in some States at least, even by circumstantial evidence alone. In *Camden* v. *Belgrade*, 75 Me. 126, 137, the Supreme Court of that State said: "Whether circumstantial evidence will suffice to establish in a civil case of this description, the validity of a prior marriage as against a later one where there is direct proof of the performance of the ceremony, must depend always upon its character and force, in each case where it is presented. We cannot say, until it has been heard, that it will not outweigh the counter evidence, and any presumption of innocence there may be to overcome."

There is the most positive and direct evidence of the first or Gale ceremonial marriage, if believed; and why should it not be believed? Elizabeth Gale Thorndike has no pecuniary interest in this case to warp her. She swears to a reasonable statement in a way that inspires confidence, and is corroborated by many circumstances. Her husband cohabits with her as husband and wife for eleven years, introducing her to his family and friends as his wife, detailing the circumstances of his marriages to his nearest blood relatives, and introducing the clergyman that performed the marriage ceremony, and executing a deed over his hand and seal acknowledging her as his wife ten years after their marriage. After all those years he deserts her by quitting the country and residing in foreign parts for eight years. When he returns to America he lives on farms in different States for five years

and it nowhere appears, as we understand the evidence, that his wife knew of his whereabouts until the time she learned of his death. That she did not seek for a divorce does not seem to us to affect her credibility, for unless she wished to marry again there was nothing to be gained by a divorce, and his long absence abroad and her ignorance of his whereabouts might easily enough be reckoned upon by him to blunt any fear of criminal prosecution. When she heard of his death and the attempt of those to secure property she did not believe belonged to them, she stated what she was willing to swear to as the truth, and it seems to us that a decent self-respecting woman, just in proportion as she was innocent, would speak out under the provocation to which, it appears, she was subjected, to protect her reputation from the imputation that she had lived meretriciously with said J. E. Thorndike for more than ten years.

Elizabeth Gale Thorndike swore that she had never been divorced from James E. Thorndike, nor had she any knowledge of his ever having obtained a divorce from her. A number of his family and acquaintances swore that they had never heard of any divorce, and no pretense was made that, if the Gale marriage ever existed, it had been dissolved by divorce, and we find nothing in the case on which to support any presumption of divorce.

In our opinion the witness Elizabeth Gale Thorndike is entitled to credence, and her testimony commands the confidence of the court.

The respondent J. Prince Thorndike having admitted in his answer that the transfers of his interest in the income of the trust estate to his wife, the respondent Flora T. Thorndike, set forth in the bill, pass his title thereto to her, we are of the opinion that she is entitled under such transfers to receive his share of said income.

In conclusion, we are of the opinion that James Edward Thorndike, mentioned in the bill of complaint, deceased leaving no lawful issue him surviving.

Decree accordingly.

STINESS, C. J.   I am unable to concur in the conclusion of my brethren.

My reasons are, first, that I am not satisfied of the fact of a ceremonial marriage between James Edward Thorndike and Elizabeth Gale. . She says they were married by the Rev. Mansfield French, in New Jersey.   Ordinarily, in marriages by clergymen, there is written evidence in three ways : by a certificate given by the clergyman to the parties ; by a record in the parish register, and a return to the town or county records.   At the time of this alleged marriage the statutes of New Jersey required a record to be kept and a return to be made to the clerk of the court of common pleas for the county, under a penalty of fifty dollars for omission so to do.   Rev. Stat. N. J. pp. 461, § 6, and 462, § 9.   In 1878, the return was changed to the town.   N. J. Sup. Rev. Stat. p. 446, § 12. We can easily imagine that, through carelessness or neglect, one or more of these records might not be made, but to my mind it is a ground of distrust when all three are lacking, as in this case.

While the subsequent conduct of the parties has some points of corroboration, it has also some which add to my distrust. At first Thorndike did address his letters to his "wife," as from her "husband," but the later ones omitted all such references.   They continued their relation for eight years, but they did not keep house, and were traveling most of the time with theatrical companies.   During the latter part of the time he lived in New York and she in Massachusetts, and they corresponded.   He went to London, and for sixteen years after that she gave no sign of claim or interest in him, even by inquiry of his family.   Upon his subsequent marriage he went to live with the respondent Hannah Thorndike, in the same State where the former reputed wife was living and then removed to New Jersey, where the former marriage was said to have taken place.   All this is possible, but bold and strange for a case of bigamy.   The holding out of a relationship of marriage would be a natural statement while the parties were living together, but the circumstances of the marriage and life with Hannah indicate an assurance on his part that the

former relation was one of misrepresentation and not of fact, and nothing appears, on the part of Elizabeth, during that time, to indicate the contrary.

Having reason to doubt that the alleged first marriage was an actual marriage, it can rest only on reputation and co-habitation; and in such cases, as stated in 1 Bishop on Mar. and Div. § 1031, on a question of legitimacy, an actual marriage of parents having been proved, a court will not let it be overthrown by showing, on the strength of cohabitation and reputation, a pre-existing marriage of one of the parties.

This statement is supported by *Clayton* v. *Wardell*, 4 Comst. (N. Y.) 230; *Chamberlain* v. *Chamberlain*, 71 N. Y. 423; *Jones* v. *Jones*, 45 Md. 144.

In *Stevens* v. *Stevens*, 56 N. J. Eq. 488, the court recognizes a tendency to favor the presumption that a subsequent marriage is valid where there is issue which may be bastardized by a contrary ruling. In this case there were children by Hannah and none by Elizabeth. The ceremonial marriage with Hannah is beyond question; and the alleged marriage with Elizabeth being, to my mind, doubtful, my opinion is, for the reasons stated, that the marriage with Hannah should be sustained.