HENRY CHAMBERLAIN, et al., Respondents, *v.* CALVIN T. CHAMBERLAIN, et al., Appellants.

Hearsay and traditional evidence is competent to prove a marriage when it is the best the nature of the case will admit of. It is not conclusive but may establish, *prima facie,* sufficient for the administration or devolution of property, that there was either a formal marriage, which cannot otherwise be proved, or that the parties agreed *per verba de presenti* to a marriage which was followed by cohabitation.

C., a widower, after living for several years with a mistress, in 1804 brought E. to his house and lived with her for three or four years during which time she had a son by him. E. had previously had two illegitimate children by different men, with one of whom she had lived and cohabited for some time. C. called E. his wife, introduced her and treated her as such while they lived together, and said, even after their separation, that they were married. His and her relatives stated frequently that they were married, and in the community they were recognized as man and wife. No record of their marriage appeared, and no witness was present. They separated; E. returned to her relatives, C. giving to her what money he had; no articles of separation were executed. C. was thereafter formally and openly married to S., a respectable widow, with whom he lived and cohabited for thirty-five years until his death. After their separation, E. joined with C. in a deed of his farm, at the request of the purchaser; C. was also procured as father to join in articles of apprenticeship of the son of E. E., after the separation, continued to bear the name of C., and asserted their marriage but she never made any claims upon C. as her husband. She survived him, but claimed no share in his property as his his widow. S. was recognized by the surrogate as his widow and her children shared in his estate, and she drew a pension to which his widow was entitled. About 1820, C. made an entry in his Bible, under the head of " A Register of my Children," which contained the names of his children by his first wife, and of those by S., but did not include his son by E. B., a son of C. by his first wife, in his will called the son of E. his brother. *Held,* that while the evidence given to show a marriage with E. was sufficient to make out a *prima facie* case, it was overcome by the opposing evidence; and taken together, the evidence established that C. was lawfully married to S., not to E.

(Argued December 3, 1877; decided December 11, 1877.)

APPEAL from judgment of the General Term of the Supreme Court, in the fourth judicial department, affirming a decree of the surrogate of Cattaraugus county upon final

settlement of the estate of Benjamin Chamberlain, deceased. The deceased died leaving a widow and no children. He left a will, a portion of which was declared invalid, and a large portion of his estate was left to be distributed under the statute.

The facts appear sufficiently in the opinion.

*H. R. Selden,* for appellants. The evidence from which the legitimacy of Simon might have been presumed, was overcome by the opposing evidence, and taken together, the evidence established that Benjamin Chamberlain was lawfully married to Sally Keyes. (*Jackson* v. *Claw,* 18 J. R., 346; *Clayton* v. *Wardell,* 4 N. Y., 230, 236; *Monktan* v. *Att'y-Genl.,* 2 R. & N., 147; 6 Cond. Eng. Ch., 438; Starkie on Ev. [10th ed.], 62–64; id., 189; 14 East. 330.) The declarations of Betsy Chamberlain, as testified to by the witness Nelson, were clearly incompetent. (1 Greenl. Ev., §§ 131–133; 6 Cond. Eng. Ch., 438.) The rule admitting declarations of deceased members of a family does not contemplate or permit the statement of an isolated and independent fact, though that fact may bear remotely upon the question of legitimacy. (1 Greenl. Ev., § 103; *Jackson* v. *Etz,* 5 Cow., 314; *McCarty* v. *Deming,* 4 Lans., 440.)

*C. C. Torrance,* for respondents. The Supreme Court did not err upon the former appeal in receiving in evidence the declarations of Effie Porter, and those of her family. (25 Wend., 205; 38 N. Y., 296–298; *Alexander* v. *Chamberlain,* 1 N. Y. Y. C., 600; 1 Greenl. Ev., §§ 176, 177.)

EARL, J. The sole question to be determined upon this appeal is whether Benjamin Chamberlain, the father of the Benjamin Chamberlain, whose property is now in controversy, was lawfully married to Effie Porter or to Sally Keyes. The courts below have determined that he was lawfully married to the former. A careful consideration of all the evidence has constrained us to differ with them.

About the year 1800 Chamberlain started from Massa-

chusetts, with his wife and six young children, to take up his residence at Belfast, in Allegany county, in this State. On his journey his wife died. He was a farmer and went upon a farm in that county. Within two or three years after he reached there, he procured a woman, by the name of Peggy Jennings, to live with him as his housekeeper. After she had lived with him some time, about the year 1804, he brought Effie Porter to his house, and she lived with him two, three or four years, and during that time a child was born to them, who was named Simon Chamberlain. Then they separated, and Peggy Jennings lived with him some years, and then they again separated. He then became acquainted with Sally Keyes, and brought her to his house and lived with her about thirty-five years, until his death, having by her three children.

According to the evidence of one of respondents' witnesses, Benjamin Chamberlain once told her that he was married to Peggy Jennings, but it is entirely clear that he was not married to her, and that his intercourse with her was meretricious. Before Chamberlain became acquainted with her, Effie Porter had had two illegitimate children by two different men, with one of whom, at least, she had lived and cohabited for some time. It is not improbable that two such persons might live together for a brief time without being married. There is no direct proof that they were ever married. No record of any marriage between them was produced, and no witness was called who was present at such a marriage. It was shown that Chamberlain called her his wife, and treated her as such while they lived together, and said, even after they had separated, that he was married to her; that his and her relatives, on many occasions, stated that they were married; that they recognized Simon as his son, and that in the community where they lived, they were generally recognized as man and wife. All this was proved by hearsay evidence and traditionary declarations, mostly given by interested witnesses, generally speaking of what they had heard, and what had transpired at times long past. It is

undoubtedly true, that while they were living together, his and her relatives supposed they were married, and that their neighbors and friends generally believed them to be married, and that he called and introduced her as his wife. They doubtless had sufficient respect for public opinion to prefer to have it believed that their intercourse was lawful rather than meretricious. Why he should admit after their separation that he was married to her, is incomprehensible. I am not convinced that he made such admissions. If he made them, it is probable that there was something in the circumstances or the language used modifying them and qualifying their force. When he is said to have made them, he was an old man, harmoniously living with Sally Keyes as his wife, after a formal marriage with her, and he had lived with her many years and had had three children by her, and he continued thereafter to live with her to his death. There was hearsay evidence that after their separation, he desired at one time to sell a farm, and the purchaser required that Effie should sign the deed, and that he procured her to do so; and that Effie desired to bind out Simon as an apprentice, and that he was procured, as father, to consent to or join in the articles of apprenticeship. These facts are undoubtedly significant, but it may well be that a purchaser of his farm, who knew them when they lived together as man and wife, might desire, to remove all doubts, that she should join in the deed; and the person taking Simon as his apprentice might desire his consent, whether he was the lawful or only the natural father of Simon. It is not unnatural that the son should be called Simon Chamberlain, as he was a son born to him in his family; and it has no great significance that Effie, having taken the name of Chamberlain while she lived with Mr. Chamberlain, should thereafter continue to be known by the same name and to assert her marriage.

Benjamin Chamberlain, Jr., in his will, calls Simon his brother, and he undoubtedly always called him so, and this he might have done whether he was a natural or a legitimate brother.

All this evidence, if there had been no countervailing evidence, would have been ample to show a marriage. To prove pedigree and marriage, hearsay and traditionary evidence is received from necessity. It is not the best or strongest evidence, but frequently the best that the nature of the case will admit of. It is not conclusive, but makes a *prima facie* case, sufficient for the administration and devolution of property, that there was either a formal marriage which cannot otherwise be proved, or that the parties agreed *per verba de presenti* to a marriage which was followed by cohabitation. (Greene Ev., secs. 176, 177; Starkie on Ev. [10th ed.], 62, 63; *Jackson* v. *Claw*, 18 Johns, 346; *Starr* v. *Peck*, 1 Hill, 270; *Clayton* v. *Wardell*, 4 N. Y., 230; *O'Gara* v. *Eisenlohd*, 38 N. Y., 296.)

But the *prima facie* case made by this evidence is fairly overcome. The presumption arising from their cohabitation for a brief period as man and wife is considerably weakened from the previous character of both parties. The fact that he called Effie his wife is not as significant as it would have been, if he had not also called Peggy Jennings his wife. His separation from Effie was not attended by circumstances which ususally attend a separation after lawful marriage. She left him more as a discarded mistress than as a discarded wife. They did not agree, and he took her back to her relatives with her child. No efforts seem to have been made to harmonize their differences and keep them together. No articles of separation were executed. There was some evidence that he gave her all his property when she left him. That was not literally true. He probably owned no land then. She did not go away taking with her cattle, horses, farming implements or household furniture, in which the property of a poor farmer must have largely consisted. He doubtless gave her all the money he could, and to this she was entitled as compensation for her services as his housekeeper. Although she lived about fifty years after the separation, she never made any claims upon him as her husband. At the time of the sepa-

ration she was still young, probably not more than thirty-five years old, and yet she did not obtain a divorce from him, although abundant grounds existed therefor if she had been married to him. She and her relatives, who seem to have been influential people, abundantly able to vindicate her rights, did not prosecute him for bigamy, although he was openly and notoriously married to Sally Keyes. She was poor, became dependent upon her relatives, and was a burthen upon them, and yet no effort was made during her long life to compel Chamberlain to contribute to her support. Although she survived him about eight years, she claimed no share in his property as his lawful widow. He was a revolutionary pensioner, and after his death, if his lawful widow, she was entitled to a pension, and yet she never claimed any.

That he was openly married to Sally Keyes in 1812, and ever thereafter to his death in 1847 lived with her, and treated her as his wife, cannot be doubted. She was a reputable widow living in Genesee county. He probably became acquainted with her through some relatives of his living near her. He told his son Calvin, the only one of his children now surviving, that he was going to be married. He went away, and brought her home, and introduced her as his wife. A witness was called who testified that she was present at the marriage, and that the ceremony was performed at her father's house by a justice of the peace, whose name she gave, in the presence of about a dozen persons, some of whom were Mr. Chamberlain's relatives. This marriage was not kept secret. Soon after it occurred, Sally showed to one of respondent's witnesses, the widow of Benjamin Chamberlain, Jr., her wedding dress. If he had been lawfully married to Effie Porter, would he have taken the risk of a prosecution for bigamy by contracting this mariage at a place not distant from his home, bringing his wife to his house and proclaiming his marriage in defiance of law? It is undoubtedly true that after this marriage, he and Sally were recognized by the community generally, and by all his

friends and relatives, as man and wife. There was proof that she visited with him as his wife, and that his children all recognized her as such, and called her mother. Much of this proof, too, is by hearsay and traditionary evidence, and has the infirmity which attaches to such evidence. But it tends to countervail the similar evidence given as to the alleged marriage with Effie Porter, and to weaken the case made by that evidence.

He lived with Sally harmoniously until he died at the age of ninety-three. He always recognized and treated her as his wife until his death. He cohabited with her, not only, as with Effie, in the vigor of life when passion may be supposed to have swayed him, but through very advanced years, when the passion which may have induced a meretricious connection must have lost its force. Some time after his marriage to Sally, and probably before 1820, he made in his Bible what purports to be a record of the names and births of all his children. It is headed : " A Register of my Children," and then follows the names and dates of births, in their order, of his six children by his first wife, and the three children by Sally. The name of Simon, the son of Effie, does not appear. The inference is very strong that when he made this formal entry, for the purpose doubtless of furnishing evidence and perpetuating the facts therein recorded, he did not regard Simon as his child in the same sense that he did all the others.

He left some property at his death. One of his children by Sally was appointed administrator, and administered upon his estate, and Sally and her children shared therein, and there is no evidence that Simon did. In the administration of the estate, Sally, and not Effie, was recognized as the lawful widow. So, too, after his death, Sally drew a pension, and to draw such pension she was required to make the formal and exact proof which the government requires in such cases, and this pension she drew, although Effie was living, and if his widow, entitled thereto.

I have now called attention to the leading features of this

case upon both sides.   It is doubtless true that the respondents have the most evidence of traditionary declarations pointing to a marriage with Effie.   But nearly all the substantial facts, which do not depend upon such evidence, point to a lawful marriage with Sally.

We, therefore, conclude that the judgment of the General Term, and decree of the surrogate, so far as appealed from, must be reversed, and cause remitted for further proof before the surrogate, the cost of all parties to be paid out of the estate in controversy.

All concur, except CHURCH, Ch. J., absent.

Judgment accordingly.