VICTOR E. GRAHAM, Respondent, *v.* FAYE GRAHAM, Appellant.

Second Department, December 23, 1924.

**Husband and wife — action by husband to annul marriage on ground that wife at time of marriage was wife of another man — former marriage alleged to have been common-law marriage — evidence shows that defendant and alleged common-law husband never agreed to marry — fact that defendant and alleged common-law husband lived together as man and wife not sufficient to establish common-law marriage — plaintiff knew of relation existing between defendant and alleged common-law husband — plaintiff is not entitled to relief.**

A marriage will not be annulled in an action by a husband, which is brought on the ground that the wife at the time of the marriage was the wife of another man who is still living, where it appears that the former marriage is alleged to be a common-law marriage; that the evidence shows that though the wife and her alleged common-law husband lived together as man and wife and represented themselves to be such, there was never any agreement between the wife and the alleged common-law husband to become husband and wife but their relations were meretricious from the beginning; and that the character of the relations between the wife and the alleged common-law husband were known to the husband seeking to annul the ceremonial marriage at the time of his marriage.

To constitute a common-law marriage there must be an agreement between the parties, a present consent to take each other as husband and wife with the resulting obligations arising from the marriage relation. It is not sufficient to establish a common-law marriage that the parties lived together and represented themselves to be man and wife.

APPEAL by the defendant, Faye Graham, from an interlocutory judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Queens on the 29th day of June, 1923, upon the decision of the court rendered after a trial at the Queens Special Term.

*Joseph Walker Magrauth* [*Edward C. Raftery* with him on the brief], for the appellant.

*Louis Boehm* [*Samuel Zeiger* with him on the brief], for the respondent.

KELLY, P. J.:

The plaintiff and defendant married before a justice of the peace on March 17, 1921. In 1922 the plaintiff brought an action against his wife to annul the marriage upon the ground that at the time of the marriage she was the wife of one Behrens who was still living. This first annulment action was discontinued and plaintiff and defendant resumed their relations as husband and wife but again separated, and in January, 1923, plaintiff began

this second annulment action based on alleged existence of the same prior marriage. The marriage ceremony between plaintiff and defendant was brought about by his continued importunities and he had previously introduced her to his mother and brothers as his intended wife.

The learned justice at Special Term has found as matter of fact that at the date of the marriage defendant was the wife of Behrens who was still living, that she became the common-law wife of Behrens in 1910, and that such common-law marriage was in full force and effect at the time of the marriage of plaintiff and defendant. There was no issue of the marriage between plaintiff and defendant. There was no issue of the alleged common-law marriage. At the trial the defendant and Behrens denied the alleged common-law marriage. Admitting the existence of meretricious relations which were fully known to the plaintiff in this action, they denied that they had ever intended to live as husband and wife or contracted to assume the marriage relation.

The learned justice at Special Term in deciding the issue, characterized the case as revealing a story of moral degradation rarely equaled in the divorce court, referred to the sordid details of the relations between the defendant and the two men involved in the triangular sexual relation, which, he said, " would disgrace the sacredness of the marriage relation in any country except Russia, where civilization is supposed to prevail." But he said, although plaintiff began his illicit relations with the defendant with full knowledge " that she claimed to be the common-law wife of Behrens, and that Behrens claimed that she was his common-law wife, and although defendant constantly for long periods of time divided her favors between Behrens and the plaintiff, his conduct is no bar to this annulment suit. * * * The rule of *pari delicto* is not a defense in such a case under the law."

But out of this moral degradation and sordid detail which naturally aroused the indignation of the learned trial justice, the defendant is left to bear the entire burden, and the meretricious relations between the three parties which it is said would disgrace the sacredness of the marriage relation in any country except Russia where civilization is supposed to prevail, are found to have resulted in a common-law marriage which is sustained as against a ceremonial marriage thereafter entered into between plaintiff and defendant, and this ceremonial marriage with all the legal presumptions as to its validity is set aside. The learned justice says that the plaintiff began his relations with the woman with full knowledge that she claimed to be the common-law wife of Behrens, and that Behrens claimed that she was his common-law

wife, notwithstanding the positive testimony of both Behrens and the defendant that no such claim was ever made, that they never intended to become husband and wife and that the character of the relation was fully known to the plaintiff.

We are forced to disagree with the finding of the learned justice at Special Term that any common-law marriage existed. The facts of the triangular sexual situation which shocked the trial justice are inconsistent with the existence of any common-law marriage between Behrens and the defendant. It is true that defendant, a · vaudeville performer, began illicit relations with Behrens, a member of the same company, in Chicago shortly after meeting him on a railroad train in 1910, that they roomed together at hotels and boarding houses first under a fictitious name and later as Mr. and Mrs. Behrens, but this was the only way in which they could continue their illicit intercourse. Later they came east and Behrens and the defendant lived together whenever they happened to be in the same town. Later on, defendant started a theatrical costume business in New York as Mrs. Behrens. When the war broke out in 1914 she was living with Behrens, who was a German, in some hotel or boarding house in New York, and when the police forced him to register as an alien enemy she also went to the police station and registered as his wife. She says she had to do it or openly admit that she was living with Behrens as his mistress. And at one time she insured her life for $2,000 and stated in the application that her name was Behrens and that she was the wife of Behrens. But through it all she testifies that she, and Behrens as well, had no doubt as to the real nature of their relations. Behrens corroborates her. The plaintiff was carrying on his relations with her from time to time. Behrens knew of her intimacy with plaintiff. At one time in 1918 the plaintiff, defendant and Behrens were together in Chicago. The plaintiff and Behrens quarreled about the woman. Plaintiff testifies that Behrens wanted him to leave her alone and that " after a lot of talk I said I would leave her provided that he [Behrens] would agree to a ceremonial marriage * * *. I said * * * I would leave her provided he would consent · to a ceremonial marriage with her, that I wanted her to have his protection if I was leaving her." Behrens testifies that plaintiff said " he was madly in love with her and wanted to marry her; * * * he told me if I don't want to marry her that he should marry her." Defendant testified that plaintiff said: " All right, you have no right to tell me I cannot marry her. Why don't you marry her yourself if you don't want me to marry her," and Mr. Behrens said: " All right, I will." The defendant says she objected,

but on the following day the three of them, plaintiff, defendant and Behrens, journeyed to Crown Point, Ind., taking with them a woman friend so that the marriage could take place. But they were unable to get a marriage license, the marriage did not take place, they returned to Chicago. Behrens came back to New York, the plaintiff remained in Chicago with the defendant. All through this record it is apparent that defendant and Behrens never considered themselves to be husband and wife. It was a continuance of the original illicit intercourse. The hotel clerks, the boarding house keepers, the customers of the costume shop may have regarded them as husband and wife, but that is not enough. Laying aside the presumption of the validity of the ceremonial marriage between the plaintiff and the defendant, and it is one of the strongest presumptions in the law, laying aside the presumption that the relations between defendant and Behrens, meretricious at the outset, continued to be meretricious, there was no evidence in this case to sustain the finding of a common-law marriage between defendant and Behrens. To constitute a common-law marriage there must be an agreement between the parties, a present consent, *per verba de præsenti,* to take each other as husband and wife, to enter into a relation which was to continue until death did them part, with the resulting obligations of husband and wife. This consent is of itself sufficient, *but for it there is no substitute or equivalent.* (2 Kent Com. 77; *Brinkley* v. *Brinkley,* 50 N. Y. 185; *Harbeck* v. *Harbeck,* 102 id. 714; *Foster* v. *Hawley,* 8 Hun, 68; *Smith* v. *Smith,* 194 App. Div. 543; *Bates* v. *Bates,* 7 Misc. 547, FREEDMAN, J.) In the absence of this intention and agreement, the facts of their sexual relations, that they lived together, that they used the same name, that they were regarded as husband and wife, do not supply the deficiency. Without this mutual · *bona fide* intention and agreement there is no marriage at common law, under the statute (Dom. Rel. Law, § 10), or, for that matter, in the ecclesiastical law. Certainly it would be most unusual that the plaintiff should maintain illicit sexual relations with the wife of Behrens with the full knowledge of Behrens and without interruptions of the relations between Behrens and the defendant. I do not say such a situation is impossible, but the sordid and degrading details of the relations of the parties referred to by the trial justice seem to point unerringly to the conclusion that the woman was not the wife of Behrens and that plaintiff knew she was not the wife of Behrens. When plaintiff in 1918 was insisting that if Behrens objected to the marriage of plaintiff and defendant, he, Behrens, should marry her, at the time of the strange journey to Crown Point, Ind., it is very apparent that

the plaintiff knew that defendant was not the wife of Behrens. But the marriage did not take place. Evidently Behrens was objecting to the marriage of plaintiff and defendant. But plaintiff was determined to marry the woman. He took her to lawyers in Chicago and New York to ascertain whether Behrens had any legal claim on her. Some of them said it would be safer to obtain a divorce from Behrens, some of them said no divorce was necessary. Plaintiff says that in December, 1918, after the Crown Point episode, he brought defendant to " an attorney, my attorney " (not the attorney for plaintiff in this action), and the then attorney for the plaintiff drew up affidavits to be signed and verified by the defendant and Behrens in which the nature of their relations was fully disclosed, in which both parties stated that they had never been married and had never regarded each other as husband and wife. They stated that they appeared as man and wife " for convenience only." " We knew that we would not be admitted to the hotel unless we posed as man and wife." They say that they referred to one another as husband and wife " merely to lend an appearance of respectability to our relations." When the costuming business was started in New York they say the use of Behrens' name was continued " for business reasons." In these affidavits prepared by plaintiff's lawyer in 1918 they declared that no common-law marriage existed and that both of them " have at all times felt free to sever our relationship at will." Behrens in his affidavit declared that defendant " is perfectly free at this time to cease living with me and to marry in accordance with her desires; " the defendant made a similar statement with regard to Behrens.

These affidavits were prepared by the plaintiff's lawyer at the plaintiff's request. He continued his relations with the woman and on March 17, 1921, married her before a justice of the peace.

In the case of *Stokes* v. *Stokes* (198 N. Y. 301) the Court of Appeals reversed a judgment of this court (128 App. Div. 838) affirming the judgment of the Special Term which refused to annul a marriage upon the ground that defendant wife had a husband living when she contracted the marriage with Stokes. In that case the first marriage was not disputed, the first husband was still living. But the Special Term held that the plaintiff, knowing all about the first marriage, still persisted in marrying the defendant and that because of other conduct on his part it was inequitable and unjust to annul the marriage. The trial court refused to grant him relief, and the judgment was affirmed in this court. The Court of Appeals reversed because the first marriage was undisputed, the first husband was alive at the date of the second marriage and because Stokes,

the plaintiff, had never advised the defendant that she had a right to remarry. But Judge VANN said at the close of his opinion (p. 312): " it may well be that there are extreme cases where the position of the party seeking relief of the kind sought here is so inequitable that a court of equity will refuse to interfere."

I think the facts in this case present an extreme case such as is referred to in the opinion of the Court of Appeals. In the case at bar, if there had been a ceremonial or other valid marriage between Behrens and the defendant, I would not hesitate to annul this marriage with plaintiff no matter what his knowledge of defendant's past life might have been, no matter how contemptible his action might appear to be. But that is the distinction between the *Stokes* case and the case at bar. Here the existence of the marriage to Behrens is denied. Defendant denies it, Behrens denies it. I think the evidence in the case shows that no such relation existed between Behrens and the defendant. I think she should not be selected to bear the brunt of the degradation and sordid relations disclosed in the evidence and that the courts of this State should leave the plaintiff and defendant where it found them.

The interlocutory judgment annulling the marriage of the plaintiff and defendant should be reversed upon the law and the facts with costs, and judgment rendered for the defendant dismissing the complaint.

RICH, JAYCOX, MANNING and YOUNG, JJ., concur..

Interlocutory judgment annulling the marriage of plaintiff and defendant reversed on the law and the facts, with costs, and judgment unanimously rendered for defendant dismissing the complaint.

This court reverses the second finding of fact of the learned justice at Special Term as contrary to the evidence and disapproves the conclusions of law. This court finds the facts as requested by the defendant in requests to find numbered third, fourth, fifth, sixth, seventh, ninth and tenth, and finds as matter of fact the facts stated in the requests for conclusions of law presented by defendant numbered first, second and sixth, and as conclusions of law the third, fourth, eighth and ninth conclusions of law requested by defendant. Settle order on notice.