In the Matter of the Judicial Settlement of the Accounts of The First Trust and Deposit Company and Another, as Administrators, etc., of Marie Effie Pratt, Deceased.

Esther B. Mooney and Another, Appellants; The First Trust and Deposit Company and Another, as Administrators, etc., of Marie Effie Pratt, Deceased, and Others, Respondents.

Fourth Department, June 30, 1931.

*Miller & Gillon* [*John Goodrum Miller* and *Wilfred H. Gillon* of counsel], for the appellants.

*Hammond, Lennox, Martin & Wilson,* for the administrators, respondents.

*Costello, Cooney & Fearon* [*George R. Fearon* with them on the brief; *Thomas H. Thurlow* of counsel], for the respondent Benjamin W. Jones.

*John C. McLaughlin,* special guardian for unknown infants and heirs.

EDGCOMB, J. On this appeal we are called upon to determine who inherits the personal estate of the decedent, Marie Effie Pratt. If the respondent, Benjamin W. Jones, was her lawful husband at the time of her death, he is entitled to it; otherwise it descends to the appellants, Esther B. Mooney and Doris E. Mooney, next of kin of Charles E. Pratt, a late husband of decedent, pursuant to the provisions of subdivision 16 of section 98 of the Decedent Estate Law,* as it stood on March 17, 1929, the date of her death.

---

* As amd. by Laws of 1913, chap. 489. Since amd. by Laws of 1929, chap. 518 (in effect April 11, 1929); and Laws of 1930, chap. 174.— [REP.

On April 26, 1910, decedent and Mr. Jones were married by an Episcopal clergyman. The union was not what might be called a happy one, and it turned out to be short lived. On August 30, 1910, four months after the ceremony, the parties entered into a separation agreement, whereby they consented to live separate and apart.

Both continued to reside in Syracuse until April, 1911, when Mrs. Jones went to Reno, where divorces are easily and quickly obtained. After remaining there six months, just long enough to gain a residence, she commenced an action against her husband for divorce, upon the grounds of cruelty, failure to support and willful abandonment. During all this time respondent Jones remained in Syracuse. Service of the summons upon him was made by publication, pursuant to an order of a judge of the District Court of Nevada. Mr. Jones filed a verified answer, denying the charges made by his wife. When the action came on for trial in the District Court of Nevada, Jones appeared by his attorney, but took no active part in the trial. He was evidently content to give his wife her freedom. Judgment dissolving the bonds of matrimony existing between the parties was granted on January 5, 1912.

Mr. Jones, having voluntarily appeared in the divorce action, and having submitted himself to the jurisdiction of the Nevada court, cannot be heard, in this proceeding, to attack the judgment of that court dissolving his marriage to decedent. (*Guggenheim* v. *Wahl*, 203 N. Y. 390; *Kinnier* v. *Kinnier*, 45 id. 535; *Tiedemann* v. *Tiedemann*, 172 App. Div. 819; *Stewart* v. *Stewart*, 198 id. 337.)

On January 5, 1912, the relation of husband and wife, which had formerly existed between Mr. and Mrs. Jones, was terminated, and they became legal strangers to each other; no claim can successfully be made that the ceremonial marriage between the two had never been dissolved. Notwithstanding this fact, the parties were at liberty to marry again, the same as if they had never been married.

The respondent claims that after the Nevada divorce he and his former wife entered into a valid and binding contract of marriage, and that, by reason thereof, they were husband and wife at the time of the latter's death. This was the view taken by the surrogate, and the ground upon which he found in favor of the respondent.

To create a valid marriage in this State a ceremony is not necessary. Marriage is a civil contract. (Dom. Rel. Law, § 10.) Common-law marriages are valid and binding. (*Matter of Ziegler* v. *Cassidy's Sons*, 220 N. Y. 98; *Matter of Haffner*, 254 id. 238.)

To constitute a common-law marriage there must be an actual, *bona fide*, mutual agreement between the parties to enter into

a permanent marital relation, which must be consummated by their cohabitation as husband and wife, or by their mutual and open assumption of marital duties and obligations. No solemnization or other formality, apart from the agreement itself, is necessary.

The mere fact that the parties have cohabited together is not sufficient to prove such a marriage. The cohabitation must be matrimonial and not illicit. (*Graham* v. *Graham*, 211 App. Div. 580, 583; *Rose* v. *Clark*, 8 Paige Ch. 574; *Matter of Hamilton*, 76 Hun, 200, 207; *Eldred* v. *Eldred*, 97 Va. 606, 626.)

Like any other contract which requires for its validity the full and free consent of both parties, there can be no marriage, ceremonial or non-ceremonial, without the mutual acquiescence of both the man and the woman. A promise by one, which is not joined in by the other, cannot be made the basis of a legal union for life. The promise and *bona fide* intention to take each other for husband and wife, and to enter into the bonds of matrimony until one or the other dies, must be reciprocal, or else there can be no valid marriage. (*di Lorenzo* v. *di Lorenzo*, 174 N. Y. 467; *Graham* v. *Graham*, 211 App. Div. 580, 583.)

A non-ceremonial marriage is not required to be proven in any particular manner. Like any other pact it may be shown by direct or circumstantial evidence. (*Matter of Haffner*, 254 N. Y. 238; *Gall* v. *Gall*, 114 id. 109; *Clayton* v. *Wardell*, 4 id. 230; *Matter of Hamilton*, 76 Hun, 200, 207; *Van Tuyl* v. *Van Tuyl*, 57 Barb. 235; *Dietrich* v. *Dietrich*, 128 App. Div. 564, 567.)

It was said by Judge HUBBS, in *Matter of Haffner* (*supra*): " A common-law marriage is not required to be proved in any particular way. It is sufficient if the evidence establishes that legally competent parties *in præsenti* intended to become husband and wife and thereafter lived and cohabited as husband and wife."

Hearsay and traditional evidence, as well as an admission of a party, is competent to prove a marriage when such evidence is the best the nature of the case will afford. (*Chamberlain* v. *Chamberlain*, 71 N. Y. 423; *People* v. *Portman*, 159 App. Div. 702; *Christy* v. *Clarke*, 45 Barb. 529.)

Cohabitation between the parties and a mutual acknowledgment on their part that they are man and wife, coupled with a general reputation that they sustain such relation to each other, do not, in and of themselves, constitute a marriage; all this is simply evidence which, if strong enough and not successfully controverted, raises a presumption that the parties are husband and wife, and justifies the trier of the fact in finding that such is the fact. (*Matter of Brush*, 25 App. Div. 610; *Gall* v. *Gall*, 114 N. Y. 109, 118; *Chamber-*

*lain* v. *Chamberlain*, 71 id. 423; *Betsinger* v. *Chapman*, 88 id. 487; *Grimm's Estate*, 131 Penn. St. 199; *Eldred* v. *Eldred*, 97 Va. 606.)

Applying these principles to the evidence at hand, we think that any finding of a common-law marriage between decedent and respondent is not justified. A brief *résumé* of the evidence will, we believe, demonstrate that fact.

Soon after the Nevada decree, and prior to her return to Syracuse, decedent mailed to her former husband a postal card, upon which was printed a sentimental poem, entitled " Old Pal," and which expressed a wish to " live the old days over " and to " chum " together once more. After her return to Syracuse from Reno, decedent and her former husband were riding together on one occasion in the latter's car, when they met respondent's brother, and decedent remarked, " Bennie is going to be with me; those papers don't mean anything. We are going to live on as man and wife just as we did before." So far as the record shows, Jones said nothing. It was a one-sided announcement. There is evidence that from that time on respondent and decedent cohabited and lived together in houses owned by the latter, and in various apartments, and that he did the usual work of a married man about these places, and that he was seen on several occasions coming out of one of these apartments in the morning. Whether Mr. Jones had any other place of abode during this time we are not told. It does not appear whether he voted from the residence of decedent, or from some other place. Neither are we informed as to where his domicile was listed in the city or telephone directory. The record is silent as to who paid the household bills. On several occasions decedent introduced Mr. Jones to her neighbors as her husband.

It is rather difficult to believe that a woman would go to all the trouble and expense of moving from New York to Nevada, and staying there for six months to gain a residence, and then remain three months longer, all for the purpose of getting a divorce from her husband, whom she had left after living with him but four months, and then, as soon as she got what she wanted, rush back to her divorced husband, make a contract to live with him as his wife, and undo all she had labored so hard to accomplish. There is no explanation for such a sudden change of heart.

Outside of living in the same house or apartment with her for a time, and doing various chores about the house which the ordinary husband is accustomed to do, there is no evidence showing any consent on Jones' part to resume marital relations with decedent, unless his acquiescence in such a program can be inferred from his

silence on the several occasions when his former wife made her pronouncement.

The burden of showing the existence of a valid marriage between Jones and the decedent rests on the respondent. It is he who asserts it, and whose right to inherit from decedent depends upon his being able to establish its existence.

The validity of any common-law marriage is open to suspicion. Clear and convincing evidence is necessary to establish its existence. Especially is that true where, as here, one of the parties is dead. (*Boyd* v. *Boyd*, 252 N. Y. 422, 428.)

No children are involved here, and we are not troubled with the question of the legitimacy or illegitimacy of any offspring of decedent.

Even if we assume that respondent's evidence, standing alone, was sufficient to make out a *prima facie* common-law marriage, the presumption thus arising has more than been dispelled by the evidence produced by appellants.

While respondent apparently cohabited at times with decedent at her various places of abode up to 1926, the evidence fails to show that they ever saw each other after that date. Decedent died in the house of a stranger, and Jones, although residing in the same city, did not go to see her during her last illness. He did not claim her body, or see that she was given a proper burial. He left that to others. It does not appear that he was present at the funeral.

Although living in Syracuse all this time, he permitted two entire strangers, a trust company and an undertaker, to be appointed administrators of decedent's estate, a position to which he was entitled, if in fact he was her husband. (Surr. Ct. Act, § 118, as amd. by Laws of 1925, chap. 574.) The record is silent as to who applied for such letters. The respondent permitted the appointment of these outsiders to be made, and suffered them to administer the estate, without apparent protest on his part. Such conduct hardly seems compatible with his present claim.

Mr. Jones was never seen out with the decedent after the Nevada divorce, except on one or two occasions. He never introduced her to his friends or acquaintances as his wife, and, so far as the record shows, never recognized or acknowledged her to be such. No act of his, unless it be his presence in her home, and the doing of various chores about the house which the ordinary husband is accustomed to do, even indirectly proclaimed that he had ever consented to resume marital relations with his former wife.

The record is replete with undeniable assertions of decedent which show conclusively that after the Nevada divorce she did

not consider herself to be the wife of Jones, and which negative any inference of a marital relation between the two at the time of her death.

The Nevada decree did not give decedent the right to resume her former name. Her real name, therefore, was Jones. This takes away any weight which might otherwise be given to the fact that she was known to some of her acquaintances as Mrs. Jones. Although she had no legal right so to do, she dropped the name of Jones when she came to sign legal papers, except where she was deeding property which had been conveyed to her under that name.

In October, 1927, she executed a trust agreement to the First Trust and Deposit Company of Syracuse under the name of Marie Effie Pratt. From January, 1913, until August, 1915, she took and discharged mortgages under the name of Marie E. Pratt. In one of these discharges she styles herself as " Marie E. Pratt, formerly Jones." On the 24th of February, 1916, she executed and acknowledged a deed to real property owned by her, in which she describes herself as " Marie E. Pratt, unmarried." All this was after the date of the alleged common-law marriage. In the light of these assertions, how can it be said that decedent was holding herself out to the public as the wife of respondent?

Evidence of admissions made by her tending to show a marital relation between the two, which evidence at best should be scrutinized with care and acted upon with caution (*Gnichtel* v. *Stone*, 233 N. Y. 465, 469; *Tousey* v. *Hastings*, 194 id. 79; *Matter of Buckler*, 227 App. Div. 146, 149, 150; *McCallum* v. *Pickens*, 126 Misc. 436, 438; affd., 217 App. Div. 714), loses its probative force in the light of this indisputable evidence, showing a studied refusal on her part to use the name of the very man to whom it is now claimed she was married, and which name, even though she was not married to him, she had a legal right to use; and in the further light of her deliberate declaration, over her acknowledged signature, that she was not married. In the face of these written declarations it is evident that after the Nevada divorce decedent did not regard herself as the lawful wife of respondent?

If the acts of Jones and his former wife were such as to arouse the suspicion of decedent's friends and neighbors, what is more natural than that she would want to put her best foot forward, and convey the idea that such relations were not meretricious? Is it strange, therefore, that she should have introduced Jones as her husband to those who found him in her home? Such an introduction would not be overstrained, for he had in truth been her husband at one time.

I think that the evidence fails to show a mutual consent between Jones and decedent to take each other for husband and wife, and to enter into a marital relation to continue until death did them part. Without such consent and agreement there could be no common-law marriage.

*Matter of Haffner* (254 N. Y. 238), relied upon by the court below, is clearly distinguishable from the case at bar. There the parties had entered into a ceremonial marriage, which was invalid because both had been married before and neither had been legally divorced. Their desire and intent to enter into a valid marriage was apparent, and both thought that they had a right so to do. The impediment to their union was finally removed by the death of their undivorced mates, after which they continued to live together and cohabit as man and wife. They were frugal and invested their earnings in joint bank accounts. They withdrew money from such account, and put it into mortgages, some of which were taken in their names as husband and wife. There was nothing which indicated an intent on their part to enter into any meretricious relation. On the contrary, it was evident that they thought they were legally married, and intended to live together as man and wife, so long as they lived. Under these circumstances a finding of the existence of a common-law marriage was held to be justified by both the law and the facts.

This being an appeal from a decree of the Surrogate's Court, we have the same power to decide all questions of fact which the surrogate had, and may reverse, modify or change the decree as justice may require, and if necessary make new findings. (Surr. Ct. Act, § 309; *Matter of Simmons*, 213 App. Div. 32; *Matter of Tangerman*, 226 id. 162; *Matter of Van Alstyne*, 142 id. 209.)

I think that the decree so far as appealed from should be reversed, and that the matter should be remitted to the Surrogate's Court, with directions to enter a decree that the administrators pay to Esther B. Mooney and Doris E. Mooney, share and share alike, the balance of decedent's estate in their hands, after the payment of any costs and allowances.

All concur. Present — SEARS, P. J., CROUCH, TAYLOR, EDGCOMB and THOMPSON, JJ.

Decree so far as appealed from reversed on the facts and matter remitted to the Surrogate's Court for further proceedings in accordance with the opinion, with costs against the respondent Jones personally.