In the Matter of the Estate of ERNEST L. HEITMAN, Deceased.

Surrogate's Court, Niagara County, March 22, 1935.

*Fogle, Bedenkapp & Andrews* for the petitioner Ricka Thiel.

*Thomas J. McKenna,* for the petitioner Maude Heitman.

*Storrs & Storrs,* for the contestant, Anna B. Short.

GOLD, S. Ernest L. Heitman, late of the city of Lockport, Niagara county, died in the town of Wilson, Niagara county, on September 2, 1934, and at the time of his death was a resident of Niagara county.

On September 8, 1934, a petition was filed herein by Ricka Thiel, a sister of decedent, praying that letters of administration issue to her. An amended petition was filed by said Ricka Thiel on the 12th day of September, 1934. In each of said petitions the persons having equal right to letters of administration are two sisters, the petitioner, Ricka Thiel, and Anna Short.

On September 14, 1934, a petition was filed by a person designated as Maude Heitman and claiming to be the widow of said decedent, praying that letters of administration issue to her.

On September 26, 1934, an answer was filed by Anna B. Short, sister of decedent, in which she denies that said Maude Heitman is the widow of decedent and praying that letters be issued to her.

Consequently, there are three persons requesting letters of administration.

Decedent had resided at 28 Minard street in the city of Lockport for a number of years. His wife died early in May, 1934, and he continued to maintain his home at the address aforesaid after her death and his sister, Anna B. Short, continued to reside with him. He was maintaining this home at the time of his death.

The alleged widow, Maude Heitman, bases her claim for letters of administration upon an alleged common-law marriage, which she claims was entered into by herself and decedent in Erie, Penn., on the last Saturday in June, 1934. On the date of the alleged marriage, decedent and the alleged Maude Heitman were residents of the city of Lockport. It is claimed by her that she and Heitman went to Erie, Penn., and then and there agreed to become husband and wife; that they stayed there over night and left early the next morning and returned to New York State and never did reside in the State of Pennsylvania.

The alleged widow claims that the witness Frank Scinta accidentally met decedent and herself in a restaurant in Erie, Penn., and that deceased introduced her to Scinta as his intended wife and said that they were to get married. It being a Saturday afternoon, it is claimed that said Scinta told them that they could not obtain a license and that he then told deceased he should consult a lawyer; that he then invited deceased to bring the alleged widow to his apartment while he went to the lawyer's office. It is claimed that deceased then left him, stating that he was going to see a lawyer; that later deceased returned and said he had found out a common-law marriage was good in Pennsylvania and that then the alleged marriage agreement was entered into. Scinta admitted, however, that deceased told him that he had a cousin or niece living around there and that he did not want her to know anything about the marriage.

Subsequent to that day, the alleged widow's evidence shows that on the 1st day of July, 1934, decedent paid the rent for the premises at 225 Highland avenue in the city of Buffalo, where the alleged widow resided; that they visited a furniture store, where the alleged widow selected some furniture, but only a small part thereof was paid for by decedent and delivered; that at the time the rent was paid and the furniture purchased, the alleged widow and deceased represented themselves to be Mr. and Mrs. Heitman. There was testimony that a private telephone was installed and that Mr. Heitman agreed to pay the telephone company's charges. A cleaning woman also testified that she was employed at 225 Highland avenue and knew the alleged widow and deceased as Mr. and

Mrs. Heitman. Another witness testified that she met the alleged widow and decedent on July 4, 1934, and that they introduced themselves to her as Mr. and Mrs. Heitman. A daughter of said last witness testified to the same effect. Two other witnesses testified similarly.

During all this time the decedent was maintaining the home in which he had resided for years on Minard street in the city of Lockport.

Four letters claimed to have been written by decedent to the alleged widow were received in evidence and were written in the month of July, 1934. However, there is nothing in the language of the letters to indicate that deceased regarded the alleged widow as his wife. The envelopes containing said letters were not produced and there was no proof that the letters were mailed to the alleged widow under the name, " Mrs. Heitman." The letters having been received by her and the envelopes not produced in court would raise a strong presumption that they were not so addressed.

A witness was produced from the publishers of the Buffalo City Directory, who testified that she called at No. 225 Highland avenue and that she met a man who, she claimed, was decedent and who gave her the names of himself and the alleged widow as living there. The name appearing in the directory was " Heighman " rather than " Heitman." The force of the testimony of this witness was lost, however, upon her description of the man whom she claimed she met. She claimed the man she met was a large man weighing at least 250 pounds, which does not coincide with a proper description of decedent.

With the exception of the witnesses who testified to the payment of the rent and ordering of the furniture and telephone installation, the witnesses produced by the alleged widow, with the exception of Scinta, were all friends of the alleged widow.

The reputation of Scinta was strenuously attacked by witnesses representing the two sisters. There were witnesses called on behalf of said sisters who challenged the statements of Scinta and, if their testimony is to be believed, and I think it should be, the testimony of Scinta has lost its weight and effect.

As stated before, the deceased never gave up his residence in the city of Lockport. He still held out to all his friends and relatives by his actions that he was not married. If he were married to said alleged widow and wanted the public to know about the same, he would have brought her to his home on Minard street in the city of Lockport. If he had gone through a marriage ceremony with said alleged widow or any other woman, that would have been the

most natural thing for him to do. A couple may go through a marriage ceremony and keep the fact of the marriage from the public, but there is no such thing as a secret common-law marriage.

So far as the public with whom decedent was acquainted was concerned, his home was at 28 Minard street in the city of Lockport and he remained at that home practically all of the time following the death of his wife, in May, 1934, until within two weeks of his death, during which said latter period he was visiting a nephew at his cottage on Lake Ontario in the town of Wilson, Niagara county.

Decedent was found dead at said cottage, due to hanging. It is claimed by the sisters that he committed suicide and there is no evidence to dispute the same.

After his death he was brought to the city of Lockport, taken to his home on Minard street and buried from that home. After his death said alleged widow called at decedent's home in the city of Lockport, but did not claim at that time that she was his widow and made no arrangements for the funeral and made no claim to the body as being that of her husband. There was testimony that while at the home of decedent after his death, and before the funeral, said alleged widow stated that they were only good friends. The sisters made all arrangements for the funeral. At the time of the funeral the alleged widow did not go into the house, but sat in an auto outside and drove to the cemetery. She sent flowers, with a card attached upon which was simply the name, " Maude."

The reputation of the alleged widow has been seriously challenged by witnesses appearing on behalf of the two sisters. Witnesses testified that she had been connected with various resorts of ill-fame prior to the time of the alleged marriage and that illicit relations existed between her and decedent prior to the death of his wife in May, 1934. The alleged widow did not take the witness stand or offer any proof to contradict this. In fact, she appeared in court only for part of one day during the trial. She would have been a competent witness to deny a considerable part of this testimony, but did not elect to testify.

She was convicted as a disorderly person in Police Court in the city of Lockport in 1930, for running an unlawful place under the name, " May Lewis," her name at that time being Maude Moore.

When a woman's character is challenged and the challenge unanswered, the situation is much different than that of a woman of known chaste, virtuous and moral character.

" In cases of this kind the character of the parties to the alleged marriage is of much importance." (*Matter of Eichler*, 84 Misc. 667, at p. 673, citing *Chamberlain* v. *Chamberlain*, 71 N. Y. 423, and *Matter of Brush*, 25 App. Div. 610.)

" A mere formal contract is not the essential thing. Marriage is a status which may be established by the words, actions, and the lives of the parties evidencing their understanding and intent." (*Matter of Seymour*, 113 Misc. 421, at p. 427.)

" The validity of any alleged common-law marriage is always open to suspicion. Especially is doubt justified when one of the parties is dead. Clear, consistent and convincing evidence is required to establish the fact. This natural suspicion must, however, be dispelled when testimony, if reasonably believed, proves the existence of circumstances inconsistent with the absence of the alleged marriage." (*Boyd* v. *Boyd*, 252 N. Y. 422, 428.)

To establish a common-law marriage by cohabitation and reputation it must appear that the cohabitation was apparently matrimonial, continuous and regular, and that the reputation was general and not divided.

" The conduct of the parties must be such that almost anyone acquainted with them would naturally infer that they bore the relation to each other of husband and wife." (Headnote, *Matter of Craig*, 273 Penn. St. 530; 117 A. 221.)

The facts in *Matter of Brush* (25 App. Div. 610) are quite analogous to the facts in this case. In the above-mentioned case the alleged wife was known to some extent among certain of her friends as the wife of Brush. When Brush was sick during his last illness she made no effort to be present at his bedside. She made no claim then to have the right to take the place to which her position as his wife entitled her and where her duty called her if she were his wife. After his death she did not assert her prerogatives as his wife.

" The fact that she failed to assert her rights at that time is strong evidence that she had no rights to assert." (*Matter of Brush*, 25 App. Div. 610, 619.)

The same is true of the alleged Mrs. Heitman. At the time above all times when she should have asserted her rights as widow of the decedent, she did not do so, and to all intents and purposes, from the standpoint of the public, she was not his wife.

Viewing the situation as a whole, the actions of the alleged widow, subsequent to the time when the alleged common-law marriage agreement was entered into, do not justify the conclusion that they were living together as husband and wife, and, therefore, I find that no common-law marriage existed.

Let a decree be entered accordingly, and denying letters of administration to the alleged widow and granting letters of administration upon the estate of decedent to his two sisters, to wit, Ricka Thiel and Anna B. Short.