In the Matter of the Estate of KATHERINE M. O'NEIL, Deceased.

Surrogate's Court, Kings County, September 19, 1946.

*Louis N. Blatt* for Eugene Cura, petitioner, and others.

*Thomas V. Burnett* for William E. Ryan, administrator, respondent.

McGAREY, S. This proceeding was instituted for the revocation of the letters of administration heretofore issued herein,

the petitioner claiming status as the husband of the decedent. It presents another variation of the age-old problem of determining the legal effect of the cohabitation of a man and woman without the benefit of a religious or civil marriage ceremony.

The facts are not disputed. The decedent was born in Albany, New York, in 1885 and married John J. O'Neil, Jr., in a religious ceremony in the city of her birth in 1904. The sole issue of the marriage, a daughter, was born in Albany in 1906. She married in this county and State in 1925, and died here in 1929, leaving her surviving her husband and a son, the only child of the union. The latter, as the grandchild of the decedent, claims to be her sole distributee.

In 1910 decedent abandoned her husband, John J. O'Neil, in Albany and returned to her parents' home there. She disappeared from her parents' home in 1913 and there is no proof of her whereabouts until May, 1919, when she commenced living with the petitioner in Buffalo. No ceremonial marriage of petitioner and decedent was ever performed, petitioner relying on a nonceremonial marriage.

Two children, who are now living, were born to decedent while she was living with petitioner, a daughter, on June 25, 1920, baptized October 31, 1920, and a son, born September 6, 1923, and baptized February 3, 1924. Their birth and baptismal certificates give the petitioner as the father, but their mother's name is given as Catherine Sheehan, maiden name of decedent's mother. The daughter's birth certificate lists her as the second child born to the mother, while the son's certificate states that he was the sixth child born to the mother. This discrepancy is not explained nor is there any proof as to other children being born to the mother.

Petitioner and decedent lived together from 1919 to 1926, when they separated, never to live together again. Petitioner remained in Buffalo, where he and the issue of his relationship with decedent still live.

In February, 1923, in the Supreme Court, Albany County, John J. O'Neil procured a decree dissolving his marriage to decedent pursuant to the provisions of section 7-a of the Domestic Relations Law, commonly referred to as an Enoch Arden decree. There is no proof that either decedent or petitioner ever knew of the entry of that decree and no proof as to where decedent went when she left the petitioner in 1926, but it appears she returned to her mother's home in Brooklyn between 1927 and 1929. John J. O'Neil died in 1938.

While the testimony indicates that both children remained with petitioner in Buffalo after decedent left in 1926, an application for an industrial life insurance policy on the life of the son, born of their relationship, was introduced in evidence. The application is dated in 1929, was made in Brooklyn by decedent's mother, designated therein as grandmother, and contains the statement: "Grandmother is taking care of infant as whereabouts of parents is unknown." This is not explained, nor does it appear how long, if ever, the boy was in Brooklyn or when he returned to Buffalo, although one of petitioner's witnesses did testify that when decedent left petitioner in 1926 she took both children and came to Brooklyn to her mother.

In 1925, the daughter was hospitalized in Buffalo Children's Hospital on two occasions, in July for a fractured arm and again in November for a tonsillectomy. The Recovery Division of the Erie County Department of Social Welfare investigated the financial status of petitioner and decedent to determine their ability to pay for such hospitalization. The records of the department and of the hospital recite that from information, apparently obtained from decedent, the petitioner was her father and decedent her mother; both decedent and petitioner were married; that they lived together and decedent used petitioner's surname; there was one other child, a son; that petitioner was a chef but had been unemployed for two weeks, his last place of employment having closed.

Decedent's mother died in Brooklyn in 1942, testate, her residuary estate, valued at $3,000, passing to decedent.

On September 11, 1944, decedent visited Buffalo, apparently seeking information about the son, born of her relationship with petitioner, whom she had located through inquiry of the Navy Department. She registered at a hotel as Catherine O'Neil and remained four days. She sought information about petitioner at the Waiters' Alliance, asking if he was keeping company or had married or remarried. She obtained the name and address of her daughter who had married, and visited her apartment, where she introduced herself to the landlady as Mrs. O'Neil, stating she was her mother. Decedent visited with her daughter for several hours.

Decedent returned to Brooklyn and died September 21, 1944. The following Christmas a card was received from Buffalo addressed to Mrs. Catherine O'Neil, signed by decedent's daughter, in the name of her daughter, bearing the printed greeting, " For you dear Grandma."

Upon this factual demonstration, petitioner urges the court to revoke the letters of administration issued to respondent and issue letters to him, as decedent's surviving spouse. Both children born of his relationship with decedent have appeared. and seek to establish their status as children and distributees of decedent.

Except for those periods when the statute law of this State, as at present, has banned so-called nonceremonial or common-law marriages, they have been recognized in this State and marital rights and obligations flowing from them have been enforced by the courts of this State. During the period involved herein nonceremonial marriages were recognized in this State.

To constitute a valid nonceremonial marriage, a man and woman legally competent to marry must then and there take each other for husband and wife, to enter into a relationship to continue until the death of either party, with the resulting obligations of husband and wife (see *Boyd* v. *Boyd*, 252 N. Y. 422, 428). This is the contract. No less will be recognized; no more is required. An agreement to marry in the future will not suffice. Of course, in the absence of writing, such contract may be proved by other evidence. The parties, however, and they alone, generally, know what they did and what they intended to do when the relationship began.

Little difficulty has been encountered by the courts in determining the marital status and enforcing rights and obligations flowing therefrom while both parties are alive. The difficult and perplexing problems have generally arisen when one or both of the parties have died. Death has sealed the lips of the one who has died. The law has effectively closed the lips of the survivor (Civ. Prac. Act, § 347).

When large sections of this country were sparsely settled and opportunities for ceremonial marriages were limited, the failure or neglect of a man and woman to be married ceremonially can be understood. Presently there is little to prevent a man and woman competent to marry from being joined in a religious or civil ceremony. This situation has been recognized by the Legislature of this State when it banned nonceremonial marriages not evidenced by a written agreement. The present statutory requirements are salutary and necessary to the protection of family life and the moral fibre of our civilization.

Analysis of the facts in cases of alleged nonceremonial marriages not preceded by void or voidable ceremonial marriage between the same parties, shows that in most, if not all of them, there was some real or fancied impediment or bar, racial, religious, social or legal, to a ceremonial marriage.

In determining whether a relationship entered into by a man and woman, apparently matrimonial but without civil or religious ceremony, constituted a legal marriage, courts are frequently called upon to draw inferences from known facts and apply presumptions to such facts. Many times conflicting presumptions are applicable to the same facts. In determining which, if any, of conflicting presumptions to apply, the court must be guided by reason and common sense.

Chief Judge CARDOZO, writing for a unanimous court, in *Matter of Findlay* (253 N. Y. 1) in holding that the presumption of legitimacy must be applied in the light of experience and reason said at page 7: '' Since then [1732] the presumption of legitimacy, like other presumptions, such as those of regularity and innocence, has been subject to be rebutted, though there have been varying statements of the cogency of the evidence sufficient to repel it.'' And at page 8: '' What is meant by these pronouncements, however differently phrased, is this and nothing more, that the presumption will not fail unless common sense and reason are outraged by a holding that it abides. * * * Whether such a basis exists in any given instance is to be determined, however, in the light of experience and reason. *The presumption does not consecrate as truth the extravagantly improbable, which may be one, for ends juridical, with the indubitably false* (cf. *Matter of Case,* 214 N. Y. 199, 204).'' (Emphasis supplied.) And at page 11: '' There are breaths of human nature at which presumptions shrink and wither.'' And at pages 12–13: '' We have no thought to weaken the presumption of legitimacy by allowing its overthrow at the call of rumor or suspicion, or through inferences nicely poised. What we are now holding is in line with the historical development which has shorn the presumption of some of its follies and vagaries. Follies and vagaries by concession there have been. We have abandoned the ' nonsense ' of the rule of the four seas. We no longer adhere to Lord CAMPBELL's dictum (*Piers* v. *Piers,* 13 Jurist, 569, 572) that a mulatto child born of a white mother must be ascribed to the white husband, and not to the black paramour, if the husband had access to his wife during the period of gestation (Thayer, *supra,* p. 346; *Bullock* v. *Knox,* 96 Ala. 195; *Rhyne* v. *Hoffman,* 59 N. C. 335). Extravagances hardly less violent there have been at other times in insisting upon the negation of every shadowy possibility. These and nothing more we are pruning from the law.''

This same principle had been enunciated by the Court of Appeals many years before in *O'Gara* v. *Eisenlohr* (38 N. Y.

296) where the court said at page 300: " The presuming of absurdities in order to meet the exigencies of a particular case, must ever be fraught with mischief." And at page 303: " Presumptions of fact are but inferences drawn from other facts and circumstances in the case, and should be made upon the common principles of induction. * * * These extreme cases of forced and extravagant presumptions are very justly dealt with by Sir W. D. Evans (see appeal to Pothier, 331) where he says: ' The principle adopted in *Wilkinson* v. *Payne* is certainly very dangerous in its tendency, as it goes to subvert the main foundations of the distinction between truth and falsehood. He adds, many cases must occur in the administration of justice, when the wishes of those who are to decide must, from the nature of the circumstances, be in opposition to the legal right, but if we once begin to shake the rule, that the law is to command and the judges to obey; if we once admit the propriety of professing to believe as true, what we are actually convinced is not so, nobody can say where the deviation will stop, and legal certainty will be sacrificed at the shrine of judicial discretion.' "

It is in cases which have arisen after the death of one or both parties that the courts have been relegated to the task of determining from proof of the conduct, acts of the parties and acceptance of their association among relatives, friends and neighbors, whether their relationship was matrimonial or otherwise. Cohabitation, general repute and holding out are facts to be considered as showing that the necessary agreement to take each other then and there and from thence forward as husband and wife was made. These facts, however, do not make a marriage and are not the substitute for a marriage. In reaching a determination on a factual situation, while the courts should not heedlessly brand as immoral or meretricious a relationship which can be sustained as moral, they should not close their eyes nor fail to apply common sense in an effort to cloak with respectability a relationship which is not entitled to that protection.

In *Boyd* v. *Boyd* (252 N. Y. 422, *supra*) the Court of Appeals said at page 428: " The validity of any alleged common-law marriage is always open to suspicion. Especially is doubt justified when one of the parties is dead. Clear, consistent and convincing evidence is required to establish the fact."

And in *Graham* v. *Graham* (211 App. Div. 580) Mr. Justice KELLY, then Presiding Justice of this Department, said at page 583: " To constitute a common-law marriage there must be

an agreement between the parties, a present consent, *per verba de præsenti,* to take each other as husband and wife, to enter into a relation which was to continue until death did them part, with the resulting obligations of husband and wife. This consent is of itself sufficient, *but for it there is no substitute or equivalent.*" (Emphasis in original.)

Surrogate FOLEY in *Matter of Reynolds* (169 Misc. 899, 900) stated: " The tests to be applied by the trier of the facts as to the sufficiency of proof in this class of cases were restated by the Court of Appeals in *Boyd* v. *Boyd* (252 N. Y. 422). When subjected to these criteria, the weight of evidence points strongly to the conclusion that the parties never validly entered into a common-law marriage. (*Matter of Heitman,* 154 Misc. 838; affd., 247 App. Div. 855; affd., 272 N. Y. 533; *Cheney* v. *Arnold,* 15 id. 345; *Hill* v. *Vrooman,* 215 App. Div. 847; affd., 242 N. Y. 549; *Matter of Pratt,* 233 App. Div. 200; *Graham* v. *Graham,* 211 id. 580; *Matter of Auerbach,* 208 id. 163)."

Surrogate WINGATE in *Matter of Goldman* (156 Misc. 817, 820) said: " Final reliance is placed on the supposed presumption of the validity of the marriage of the alleged widow to the decedent. A presumption is merely an inference of fact of more or less potency, which is sometimes indulged in in the absence of evidence. (*Matter of Callahan,* 142 Misc. 28, 36; affd., 236 App. Div. 814; affd., 262 N. Y. 524.) Such an inference fades into nullity when confronted by uncontroverted proof to the contrary * * *. (*Matter of Findlay,* 253 N. Y. 1, 8.) "

Cases involving factual situations similar to *Matter of McNell* (187 Misc. 899), where a man and woman, who entered into a ceremonial marriage in good faith when either or both of them were not legally competent to marry, continue to live as husband and wife and hold each other out as such and are generally reputed and regarded by their friends and neighbors as husband and wife, after the removal of such impediment or impediments, are deemed to have contracted a nonceremonial marriage, are inapplicable to the present proceeding because of the absence of any ceremonial marriage between the decedent and the petitioner.

Nonceremonial marriages have been held to be established where parties legally competent to marry contracted, orally or in writing, to take each other then and there for husband and wife to continue until death. Such a contract may be presumed where such parties lived together as husband and wife until the death of one and their general reputation has been matrimonial and there has been a continuing holding out of each other as

husband and wife. This presumption is, of course, subject to rebuttal. Factual situations of this type are not applicable herein because at the inception of the relationship between decedent and the petitioner, decedent's husband by a prior ceremonial marriage was still living and the marriage had not then been dissolved or annulled.

Where one or both of the parties who were living together in an apparent marital relationship had been previously married, a nonceremonial marriage has been held to be established where such relationship continued until the death of one of the parties to the second relationship and where (1) prior to March 25, 1922, the first spouse of the party previously married had been continuously absent for five years immediately preceding the inception of the second relationship without being known to the other to be living during that period and the whereabouts of the missing spouse could not have been ascertained with due diligence, or (2) the parties to the second relationship had knowledge of the death of the first spouse or the dissolution of such prior marriage. Where a ceremonial marriage was entered into in good faith and one or both of the parties was not then legally competent to marry, but they continued to live together after the removal of the impediment to the prior marriage or marriages until the death of one of the parties to the second marriage and their general reputation continued to be matrimonial, a nonceremonial marriage has been held established. Of course, no nonceremonial marriage may be established under any of the foregoing circumstances where the impediment of the prior marriage was not removed prior to April 29, 1933, or the new contract of marriage was not entered into prior to that date.

Nonceremonial marriages have been held not to have been established by proof merely of cohabitation and general reputation and holding out where (a) either party or both are incompetent to marry at the inception of the relationship and there is no proof of a new contract of marriage after the removal of the impediment, or (b) the initial relationship is meretricious and there is no proof of a change of that relationship to a matrimonial one when both parties are competent to marry, or (c) the relationship did not continue until the death of one of the parties and is asserted for the first time after the death of one of the parties.

Applying these principles to the facts in this proceeding, the conclusion is inevitable that petitioner has failed to sustain the burden of proof of establishing a common-law or nonceremonial

marriage with decedent and his resulting status as her husband, and his petition must be dismissed.

The record does not establish that continuity of marital relationship and general reputation as to marital status in the community where the parties lived, continuing until the death of decedent, so essential to the establishment of a nonceremonial marriage.

The evidence rather supports a relationship, which could be terminated by either party at any time without any ensuing obligations. The fact that decedent left petitioner, without either party, so far as the record indicates, attempting for over a period of eighteen years to communicate with the other or being apprehensive of the welfare or whereabouts of the other, or seeking to enforce marital obligations or duties, is strongly indicative of the fact that neither party considered their relationship as matrimonial. There is absent here the ceremonial marriage, preceding the relationship, and the continuance of cohabitation after removal of the impediment existing at the time of the ceremony, which was determinative of the finding in *Matter of Haffner* (254 N. Y. 238, 241–243).

The petition is dismissed.

Submit decree, on notice, accordingly.